**UNITED STATES of America**

v.

**Luke JONES**

**No. 3:99CR264 (AHN).**

United States District Court, D. Connecticut.

Nov. 19, 2003.

Charles E. Tiernan, III, Lynch, Traub, Keefe & Errante, New Haven, CT, Gary A. Mastronardi, Robert M. Casale, Bridgeport, CT, for Defendant.

Philip Miller, Attorney General's Office, Hartford, CT, for Interested Parties.

Alex V. Hernandez, Alina Marquez, James Joseph Finnerty, III, U.S. Attorney's Office–BPT, Bridgeport, CT, James I. Glasser, Stephen C. Robinson, U.S. Attorney's Office–NH, New Haven, CT, for Plaintiff.

## RULING ON DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

NEVAS, District Judge.

Defendant Luke Jones ("Jones"), a.k.a. "Mega," has moved this court for a judgment of acquittal after a jury convicted him of, among other things, the murder of Monteneal Lawrence ("Lawrence") as a Violent Crime in Aid of Racketeering ("VICAR") pursuant to 18 U.S.C. § 1959(a). This conviction, if allowed to stand, would serve as the government's sole basis for subjecting Jones to the death penalty under the Federal Death Penalty Act ("FDPA").[1]

For the following reasons, and on the basis of a careful and thorough review of the trial record and controlling case law, the court grants Jones's motion for judgment of acquittal [doc. # 1542].[2]

## BACKGROUND

### A. The Fifth and Sixth Superseding Indictments

In the Fifth Superseding Indictment, the government charged Jones with, among other things, narcotics trafficking, murder, conspiracy to commit murder, and racketeering offenses committed as part of and in furtherance of an "Enterprise" under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.[3] The grand jury subsequently returned a Sixth Superseding Indictment that charged Jones with committing two VICAR murders. Count one charged him with the Lawrence murder. This count alleged in pertinent part that

---

1. The jury acquitted Jones of the VICAR murder of Anthony Scott (Count 2 of the Sixth Superseding Indictment), the only other death-eligible count alleged. The jury also acquitted him of using a firearm in relation to the Scott VICAR murder (Count 23 of the Fifth Superseding Indictment).

2. In light of this ruling, the court also directs the Clerk to enter a judgment of acquittal on Count 17 of the Fifth Superseding Indictment charging Jones with the use of a firearm in relation to the Lawrence VICAR murder.

3. Jones previously appeared as a defendant before this court. On September 22, 2000,

Jones pleaded guilty to possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and 924(a)(1). Jones was sentenced for this conviction on October 24, 2001. Although the sentencing range under the United States Sentencing Guidelines called for a sentence of 77 to 96 months imprisonment, the court upwardly departed to the statutory maximum of 120 months in light of Jones's criminal history. *See* Transcript of Sentencing Hearing in *United States v. Luke Jones* (3:99CR264), October 24, 2001, at 33. Jones's sentence is presently on appeal before the Second Circuit Court of Appeals.

[o]n or about November 27, 1998, in the District of Connecticut, for the purpose of maintaining and increasing his position in the enterprise, an enterprise engaged in racketeering activity, as described above, LUKE JONES, a.k.a. "Mega," the defendant herein, did unlawfully, willfully and knowingly murder Monteneal Lawrence, in violation of Connecticut General Statutes, Section 53a–54a.

All in violation of Title 18, United States Code, Section 1959(a)(1).

Count two charged Jones and two of his brothers, Leonard Jones and Lance Jones, with the VICAR murder of Anthony Scott ("Scott").

On August 22, 2002, the government filed an amended notice of intent to seek a sentence of death ("Amended Notice"). The Amended Notice provided that if the jury returned a unanimous guilty verdict on either or both of the alleged VICAR murders, Jones would be eligible for the death penalty and the case would proceed to the sentencing phase under the FDPA. *See* 18 U.S.C. § 3593(e). Conversely, acquittals on both VICAR murder counts would obviate the need for a death-penalty sentencing phase.

### B. *Jury Selection and Trial*

Several weeks before the first day of jury selection, the Clerk mailed summonses to 800 potential jurors. Included in this mailing was a detailed questionnaire prepared jointly by the court, the government, and defense counsel. The questionnaire asked potential jurors to respond to 53 questions on a variety of topics, including their views on capital punishment.

On October 7, 2003, the court began jury selection. Contrary to the court's established practice, the government and Jones's counsel were allowed to conduct individualized voir dire of potential jurors.

After three days, the court seated a jury of twelve jurors and four alternates.

Trial began on October 10, 2003. The government concluded its case on October 28, 2003. At the close of the government's case, Jones moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. Pursuant to Rule 29(b), the court reserved its ruling on the motion. Thereafter Jones rested his case without calling any witnesses or presenting any evidence. On October 29, 2003, after counsel's closing arguments, the court instructed the jury on the law, and the jury immediately commenced deliberations.

On October 30, 2003, the jury returned guilty verdicts on all counts of the Fifth and Sixth Superseding Indictments except the Scott VICAR murder (Count 2 of the Sixth Superseding Indictment) and the firearms offense related to that murder (Count 23 of the Fifth Superseding Indictment). Jones renewed his Rule 29 motion after the verdict was read. At the court's invitation, counsel submitted additional briefs on Jones's acquittal motion with respect to the Lawrence murder. On November 3, 2003, after hearing extensive argument from counsel, the court issued a one-page ruling granting the motion and stated that a ruling setting forth the court's reasoning would follow.

### STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides:

The court on motion of a defendant or of its own motion shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Fed.R.Crim.P. 29(a).

██ It is axiomatic that "[a] defendant bears a heavy burden in challenging

the sufficiency of the evidence." *United States v. Henry*, 325 F.3d 93, 103 (2d Cir.2003). When ruling on a defendant's motion for a judgment of acquittal, the district court must "view the evidence in the light most favorable to the government and draw all reasonable inferences in the government's favor." *United States v. Johns*, 324 F.3d 94, 97 (2d Cir.2003). A jury's verdict must be sustained unless "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir.2002). Further, the court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir.2000) (internal citations omitted). "The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that jury." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984).

█ Although the Rule 29 standard remains the same in all criminal cases, the court is mindful that "cases involving the possible imposition of the death penalty necessitate 'special care and deliberation in decisions that may lead to the imposition of that sanction.'" *United States v. Dhinsa*, 243 F.3d 635, 667 (2d Cir.) (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 856, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring in judgment)), *cert. denied*, 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001). Accordingly, the court has applied such "special care and deliberation" in evaluating whether the evidence adduced at trial is sufficient to sustain Jones's conviction for the VICAR murder of Lawrence.

## FACTS

### A. Jones's Role as Leader of the Drug Trafficking Enterprise in P.T. Barnum

During the course of trial, the government presented overwhelming evidence that between the dates charged in the Fifth and Sixth Superseding Indictments, Jones was the leader of two narcotics trafficking conspiracies based in a public housing project in Bridgeport known as "P.T. Barnum." Jones's drug organization (or "the Enterprise") sold heroin and crack cocaine in two areas of P.T. Barnum: (1) between Buildings 12 and 13, referred to as the "Middle Court"; and (2) near the front entrance, known as "D–Top." Jones ran the drug operations at D–Top with his brother Leonard, and in the Middle Court with his nephews Lyle, Jr., and Lonnie. It is undisputed that Jones was considered the leader of both drug conspiracies.

The evidence showed that Jones, Lyle, and Lonnie each had "lieutenants," who were mid-level employees charged with tasks such as collecting sales proceeds from street-level dealers and protecting the Enterprise's sales turf from rival drug gangs that also operated at P.T. Barnum. Jones and other high-ranking members and lieutenants of the Enterprise regularly carried firearms, wore bulletproof vests, and were expected to use violence and intimidation to enforce the Enterprise's exclusive right to sell drugs in the Middle Court and at D–Top.

### B. "Respect" as an Essential Element of Drug Trafficking at P.T. Barnum

As several of the government's cooperating witnesses testified in detail, obtaining and maintaining "respect" were essential elements for any drug organization that

operated in the competitive marketplace at P.T. Barnum. In different areas of the housing project, other gangs sold their own brands of narcotics, including a group known as the "Foundation" and another group led by Frank Estrada ("Estrada"), Jones's principal rival for the lucrative P.T. Barnum drug market. If the Jones Enterprise did not have respect, rival drug dealers such as the Foundation or the Estrada gang would be emboldened to encroach on the Enterprise's turf in the Middle Court or D–Top, and attempt to take over those profitable areas. According to Kevin Jackson ("Jackson"), an employee and one-time lieutenant of the Jones's organization, if a drug-trafficking gang or its individual members did not have respect, rival drug organizations would "[t]ry to rob you, take your spot, get the block. Wherever you're selling, they will try to move in." (Tr. at 984.) The appearance of being "soft"—the converse of having "respect"—would weaken a drug organization's resolve and its ability to reap drug profits: "[P]eople will basically take advantage of it, come up and get drugs from you and not give you no money and not pay you." (Tr. at 983.) In the words of Jermaine Jenkins ("Jenkins"), a high-ranking employee of the Estrada gang:

> Respect did allow you to sell drugs.... You have to have respect. If you don't, people will run over you. People will beat you, your money never will be right, so if you don't have respect, you might as well not even be in the drug game.

(Tr. at 1902.)

The evidence was undisputed that Jones, as leader of his Enterprise, earned and commanded respect throughout P.T. Barnum. (Tr. at 999.) To gain and maintain respect, Jones and the members of the Enterprise as well as rival gangs cultivated a reputation for violence. According to

Estrada, "[Violence is] good for business." (Tr. at 2025.) Thus, members of the Jones Enterprise, particularly high-ranking members such as Jones, knew that they were expected to retaliate violently when a rival threatened their turf or their exclusive right to sell drugs in the Middle Court or at D–Top. Consequently, Enterprise members carried firearms and wore bulletproof vests when they sold drugs and at other times as well.

The government also presented ample evidence that Jones and members of his Enterprise committed conspicuous acts of violence to maintain respect and protect their drug-trafficking turf. For example, on August 2, 1998, Leslie Morris, a low-level drug seller for the Enterprise, murdered Kenneth Porter, a low-level drug seller for the rival Estrada gang. Although the catalyst for the violence was a dispute over money from a dice game, Morris shot Porter at the urging of Willie Nunley, a Jones Enterprise lieutenant, who berated Morris for allowing Porter to disrespect Morris in the Middle Court area. (Tr. at 1003–05.) In addition, members of the Jones Enterprise engaged in gun battles with members of the Foundation over a running dispute that began when Lyle Jones, Jones's nephew and member of the Enterprise, punched Eddie Pagan, a Foundation member, while in the Middle Court. (Tr. at 312–13.) Similarly, there was testimony that David Nunley, a lieutenant for the Jones organization, opened fire on rival gang members who were selling drugs at D–Top. (Tr. at 292–93.) On another occasion, Leonard Jones, the defendant's brother and Enterprise member, was shot in the face by Anthony Scott, a member of the Foundation. The government presented credible evidence that Jones murdered Scott to retaliate for the shooting of his brother. Although this alleged murder was one of the two death-penalty eligible offenses charged as a VIC-

AR murder, the jury acquitted Jones of this offense.[4]

## C. *The Lawrence Murder*

The key factual issue raised in Jones's Rule 29 motion concerns the Lawrence murder on November 27, 1998, which occurred in Apartment 206, Building 5, at P.T. Barnum, during a social event. At trial, the government presented four witnesses, including two eye-witnesses, to support its allegation that Jones committed the murder to maintain or increase his position in the enterprise. Based on the testimony of Teekesh Corwell ("Corwell"), Veneer Holmes ("Holmes"), Jackson, and Jeremy Thomas ("Thomas"), the following salient facts were established:

Holmes and Thomas lived together in Apartment 206 at Building 5. (Tr. at 787, 791.) On the evening of November 27, 1998, the day after Thanksgiving, they had an informal gathering in their apartment for a group of friends. One of their guests was Shontae Fewell, also known as Tae Tae ("Fewell"). Fewell was a friend of Holmes and was also Jones's girlfriend. (Tr. at 827–828, 860.) It was well known that Jones was very jealous when other men expressed interest in her. (Tr. at 1056.)

Lawrence, one of Thomas's closest friends, was also a guest at the party in Apartment 206. (Tr. at 854.) Lawrence was from New Haven and was neither a drug seller nor a drug user. (Tr. at 817.) There was no evidence that Jones or Fewell knew Lawrence or that Lawrence knew Jones or was aware that he was a member and leader of the drug-trafficking enterprise. On the afternoon and evening of the party, Lawrence purchased four bottles of grain alcohol, was drinking heavily, and appeared extremely drunk to others at the party. (Tr. at 800, 866.) Indeed, an autopsy conducted after the murder revealed that his blood-alcohol content that night was .23, nearly three times the state legal limit. (Tr. at 2292.)

At one point during the evening, Fewell asked Thomas to drive her to the northern part of Bridgeport to pick up her cousin. (Tr. at 867.) Lawrence accompanied Thomas and Fewell in the car. During the trip, Lawrence made a romantic overture to Fewell. (Tr. at 836, 867, 868.) In response, Fewell "dissed" him, which means in colloquial terms that she expressed her lack of interest in a disrespectful fashion. Lawrence responded to Fewell in kind. (Tr. at 868: "Tae Tae just flat out tried to dis' him, so Monte [Lawrence] ... dissed her back.") According to Thomas, Fewell's dissing remark related to the appearance of Lawrence's boots, and Lawrence's dissing comment concerned Fewell's coat. (Tr. at 868.)

When the three reached Fewell's cousin's home, Fewell quickly got out of the car. (Tr. at 868.) Thomas then suggested to Lawrence that he apologize to Fewell for his remark. Taking his suggestion, Lawrence apologized when Fewell got back to the car and shook her hand. (Tr. at 868–869.) At this point, Thomas mistakenly believed that Lawrence and Fewell had resolved their differences. (Tr. at 869.)

However, immediately after the car pulled into the parking lot at Building 5,

---

**4.** If the jury had convicted Jones of the Scott VICAR murder and if Jones had moved under Rule 29 for an acquittal, the court would have denied the motion and allowed the government's case to proceed to the capital phase. Although the jury did not convict Jones on that count, the court believes that the government presented sufficient evidence that Jones murdered Scott to maintain or increase his position in the Enterprise as required by 18 U.S.C. § 1959(a).

Fewell jumped out and ran upstairs to the party in Apartment 206. She told people there that Lawrence "didn't know who he was messing with" and then left the party. (Tr. at 836, 870–71, 885.) When Thomas arrived inside, he met Holmes and they walked upstairs to the second floor of the apartment. When Holmes heard Thomas's account of what had transpired in the car, she urged Thomas to drive Lawrence home and get him out of P.T. Barnum. Holmes suggested this because of Fewell's relationship with Jones and Jones's reputation for violence. (Tr. at 838, 872–73.)

Meanwhile, in another part of P.T. Barnum, Jones, presumably after hearing what had occurred between Fewell and Lawrence, asked Jackson to take a ride with him.[5] (Tr. at 1021.) Without telling Jackson where they were going or why, Jones drove to Building 5, where they met Fewell's brother, Jamal ("Jamal"). Jones, Jackson, and Jamal then walked up the stairs and entered Apartment 206 together. (Tr. at 1023.) By this time, roughly ten minutes had elapsed since the time Fewell had left the apartment. (Tr. at 801.)

When Jones entered the party, he asked those assembled, "Who disrespected my girl?" (Tr. at 1025.) Lawrence, who was visibly intoxicated and sitting in a chair, indicated that he was the person. (Tr. at 803, 1025.) Jones then grabbed Lawrence and tried to pull him up into a standing position in an attempt to drag him outside. (Tr. at 803, 1025.) Lawrence resisted Jones, stating "I ain't going nowhere," and "snatched his arm away" and tried to sit back down. (Tr. at 803, 1025.) Jackson testified that when Jones held Lawrence by the left arm, Lawrence "tried to stop [Jones] from pulling him towards [Jones]." (Tr. at 1026, 1059.) Corwell testified that Lawrence did not touch or grab Jones. (Tr. at 803, 804, 816.)

After Lawrence resisted Jones's first attempt to take him outside, Jones "grabbed him, pulled him up, and sa[id], 'Go outside.'" (Tr. at 1026.) Then, while standing less than a foot away from Lawrence, Jones suddenly pulled a gun from his right-coat pocket and shot Lawrence in the stomach and neck area. (Tr. at 804, 1027.) At the time Jones fired the shots, Lawrence was "half sitting, half standing ... trying to get away." (Tr. at 804.)

Several children and adults at the party witnessed the murder. (Tr. at 1028.) As Lawrence lay on the floor bleeding, Jamal approached and kicked him in the head, saying "Now what, you punk bitch." (Tr. at 874.) Jones walked down the steps from the apartment to the parking lot with Holmes following a distance behind, cursing and yelling at him. Jones turned around and said, "Sorry." (Tr. at 839.)

## DISCUSSION

Based on the foregoing evidence, there is no doubt that Jones intentionally killed Lawrence on the night of November 27, 1998. Nonetheless, although the evidence would be more than sufficient to support a murder conviction under Connecticut state law, the question remains whether Jones, by killing Lawrence, committed a VICAR murder pursuant to 18 U.S.C. § 1959(a). Thus, the central issue posed by Jones's Rule 29 motion is whether a reasonable fact finder could conclude from the record evidence that Jones's "general purpose" in murdering Lawrence "was to maintain or increase his position in the enterprise."

5. At the time of the Lawrence murder, Jackson was not actively employed as a drug seller for Jones's organization. (Tr. at 1078.) However, on at least one occasion that occurred shortly before the Lawrence murder, Jackson had carried a gun to defend the Middle Court on behalf of the Enterprise. (Tr. at 1079.)

*United States v. Thai,* 29 F.3d 785, 817 (2d Cir.1994). In other words, could a jury properly infer that Jones committed this violent crime because "he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.* (citations omitted). As discussed below, the court finds that under *Thai* and other controlling Second Circuit case law, the evidence supporting this VICAR motive element is insufficient to sustain a conviction for the Lawrence murder.

### A. *VICAR and Controlling Second Circuit Precedent*

▪ VICAR targets a person who, "for *the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders* ... or threatens to commit a crime of violence against any individual in violation of the laws of any State ... or attempts or conspires to do so." 18 U.S.C. § 1959(a) (emphasis added). In the seminal case construing this statute, *United States v. Concepcion,* 983 F.2d 369 (2d Cir.1992), the Second Circuit held that to sustain a VICAR conviction, the government must prove five elements beyond a reasonable doubt: "(1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant commit-

ted the alleged crime of violence, and (5) that his *general purpose in so doing was to maintain or increase his position in the enterprise.*" 983 F.2d at 381 (emphasis added).[6] The parties here agree that the record evidence is sufficient to prove the first four elements, but disagree as to the sufficiency of the evidence supporting the fifth, or VICAR motive, element.

▪ In refining the contours of *Concepcion*'s interpretation of the VICAR motive element, the Second Circuit has recognized that "[s]elf-promotion need not have been the defendant's only, or even his primary, concern, if it was committed 'as an integral aspect of membership' in the enterprise." *Thai,* 29 F.3d at 817 (quoting *Concepcion,* 983 F.2d at 381). Rather, the jury must be able to reasonably infer from the evidence that "the defendant committed his violent crime because *he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.*" *Concepcion,* 983 F.2d at 381 (emphasis added).

▪ Moreover, as the Second Circuit has explicitly recognized, VICAR convictions will be upheld when a high-ranking leader of a drug-trafficking organization committed a violent crime "for the purpose of protecting the enterprise's operations and furthering its objectives or where ... [the leader] was expected to act *based on the threat posed to the enterprise* and that failure to do so would have undermined his

---

**6.** In *Concepcion,* the Second Circuit consulted the statute's legislative history to interpret the motive element of VICAR. *See* 983 F.2d at 381. The legislative history indicates that Congress intended to provide "the option of federal investigation and prosecution ... when a murder is committed ... and the proper federal nexus ... is present." S.Rep. No. 225, at 305, *reprinted in* 1984 USCCAN at 3484. The drafters of the VICAR statute, moreover, noted that "[t]his does not mean, nor does the committee intend, that all or even most such offenses should become mat-

ters of federal responsibility." S.Rep. No. 225, at 305, *reprinted in* 1984 USCCAN at 3484. Rather, because "[m]urder ... violate[s] state law and the states will still have an important role to play in many such cases," "the need for federal jurisdiction is clear ... where local authorities might be stymied." *Id.* In the instant case, the court notes there is no record evidence that the State of Connecticut was "stymied" in its investigation or in its efforts to prosecute the Lawrence murder.

position within that enterprise." *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir.2001) (emphasis added). In the drug-trafficking context, the conduct underlying VICAR convictions has generally involved violent clashes between rival gangs over turf to sell narcotics. For example, in *United States v. Diaz*, 176 F.3d 52, 95–96 (2d Cir.1999), the Second Circuit affirmed a VICAR conviction because the evidence demonstrated that the murder "was expected of [the defendant] as one of the highest ranking ... leaders [of the drug organization] to protect the block's drug business" and that "failure to do so would have undermined his leadership position within the [organization]." Similarly, in *United States v. Reyes*, 157 F.3d 949, 955 (2d Cir.1998), the Second Circuit affirmed the conviction of the head of a large drug-distribution organization who murdered a rival who was encroaching on the defendant's drug business. *See also United States v. Rosa*, 11 F.3d 315, 340–41 (2d Cir.1993) (sustaining a VICAR conviction for a murder committed by one of the organization's leaders following a dispute over a narcotics-distribution spot controlled by the defendant); *Concepcion*, 983 F.2d at 382–83 (upholding conviction where the defendant, a lieutenant in a narcotics enterprise, initiated a gun battle in response to threat to the organization's drug business).

## B. *Analysis*

■ In this case, the evidence adduced at trial is insufficient to prove the fifth element of *Concepcion*, even when all reasonable inferences are drawn in the government's favor. The court so concludes because the key factual predicates present in *Concepcion* and its progeny are absent here. In short, the government has failed to prove that Jones, in responding to Lawrence's personal acts of disrespect, "was expected to act based on the threat posed to the enterprise and that failure to do so

would have undermined his position within that enterprise." *Dhinsa*, 243 F.3d at 671 (emphasis added).

First, unlike the victims in cases such as *Concepcion* and *Diaz*, Lawrence was not affiliated with a drug-trafficking organization and did not pose a threat to Jones's drug-trafficking activities or the Enterprise's drug turf. To the contrary, the undisputed evidence shows that Lawrence was not from Bridgeport and had no involvement whatsoever in narcotics trafficking. (Tr. at 817.) In fact, prior to the murder, Jones and Lawrence had never met or heard of each other. (Tr. at 817.) There was also no evidence that Lawrence knew that Jones was Fewell's boyfriend or the leader of a violent drug gang. Rather, Lawrence was merely a friend of Thomas attending a social gathering at an apartment in P.T. Barnum. (Tr. at 854.)

Second, the factual circumstances surrounding the Lawrence murder bear no tangible connection to Jones's leadership of the Enterprise or its drug-trafficking activities. To the contrary, the murder resulted from a purely personal dispute between Lawrence and Fewell that arose when she spurned Lawrence's romantic advances: "Tae Tae just flat out tried to dis' him, so Monte [Lawrence] ... dissed her back." (Tr. at 868.) Lawrence's conduct toward Fewell was not directed at Jones and was not related to the drug-trafficking activities of Jones or the Enterprise. (Tr. at 868.) Further, it is undisputed that Jones was a "very jealous" boyfriend, and there is no evidence that Lawrence was aware of that jealousy. (Tr. at 1056.)

### 1. *The Government's Factually Unsupported Inference That "Respect" Was the VICAR Motive for the Lawrence Murder*

Nevertheless, the government contends that because Jones cultivated a reputation

for violence at P.T. Barnum to gain and maintain respect, a jury could reasonably infer that his general purpose in murdering Lawrence was to maintain or increase his position in the Enterprise. The government places great emphasis on Jones's status as the "walking, talking embodiment ... of fear and intimidation in the Middle Court." (Tr. at 3206–07.) According to the government, Lawrence committed two acts of disrespect, both of which required Jones to respond with violence. The first act of disrespect occurred when Lawrence "dissed" Fewell in the car. The second act of disrespect occurred when Lawrence failed to obey Jones's command to get out of the chair and to accompany him outside. The government maintains that Jones was required by his position and membership in the Enterprise to react to Lawrence's disrespect with violence: A failure to retaliate would erode his position as leader of the Enterprise, weaken his and the Enterprise's reputation for violence, and compromise the Enterprise's ability to maintain its hold on the lucrative drug business in the Middle Court and at D–Top.

But the facts do not persuade the court that a jury could reasonably infer that Jones was acting with an Enterprise-related motive when he shot Lawrence in response to the alleged disrespect. Indeed, there is no evidence to support the government's strained inference that Jones had a generalized need to use violence in response to all acts of disrespect—regardless of whether the disrespect was directed at him personally or was related to the affairs of the Enterprise—in order to maintain his position in the Enterprise or to further the Enterprise's objectives. Without such evidence, this inference is based only on speculation.

The record is replete with evidence that Jones and his associates committed violent acts against individuals who threatened the Enterprise's drug operations in the Middle Court or at D–Top. The same record, however, is bereft of any incident, other than the Lawrence murder, where Jones or Enterprise members violently retaliated for a personal act of disrespect committed by an individual who did not pose a threat to the Enterprise's drug-related activities. Without such evidence, it is impermissible to infer that Jones's violent response to Lawrence's acts of disrespect was related to the Enterprise's affairs or was an integral aspect of Jones's membership in the Enterprise.

Indeed, the very evidence on which the government relies is inconsistent with its broad "respect as motive" theory. At oral argument, the government cited three instances in which the Jones Enterprise responded violently to acts of disrespect: (1) the shooting initiated by David Nunley after Leonard Jones told him that a rival group was selling its drugs at D–Top; (2) the murder of Kenneth Porter, a low-level employee of the Estrada group, by Leslie Morris, a low-level employee of the Jones Enterprise; and (3) the gun skirmishes between the Jones Enterprise and the rival Foundation gang that began after a fistfight between Lyle Jones, Jr., and Eddie Pagan in the Middle Court. (Tr. at 3197, 3199, 3203.) In each instance, the victim of the Jones Enterprise's retaliatory violence was a member of a rival drug organization that, by its very presence in P.T. Barnum, posed a threat to the Jones organization and its drug turf. Moreover, the other VICAR murder charged in this case, the murder of Foundation member Anthony Scott, was an act of retaliation by Jones for Scott's shooting of Jones's brother and fellow drug seller, Leonard.[7]

7. The government's evidence also demonstrates that even in the world of street-level

In short, the government's theory leaves no principled basis for distinguishing between violence that is within the ambit of VICAR and violence that is not within its reach. The government's argument that any personal act of disrespect toward Jones was tantamount to an act of disrespect against the Enterprise blurs *Concepcion*'s distinction between violent crimes that are committed in connection with a criminal enterprise's affairs and those that arise from purely non-enterprise-related matters. Indeed, taking the government's theory to its logical conclusion, any act of violence committed by a member of a drug-trafficking group, whether related to its drug-trafficking objectives or not, would be a VICAR offense.[8] Such reasoning violates *Concepcion*'s holding that only offenses committed to maintain or increase a defendant's position in a RICO enterprise are properly subject to prosecution under VICAR.

2. *Other Unwarranted Inferences From the Evidence Regarding the Lawrence Murder*

█ Next, since the evidence does not show that Jones or other Enterprise members reacted with violence to maintain or increase their position in the Enterprise when faced with personal acts of disrespect, a jury could not permissibly infer from the trial record that Jones murdered Lawrence to further the Enterprise's drug-trafficking objectives or because he

---

drug racketeering at P.T. Barnum there was a clear delineation between a drug organization's affairs and the personal affairs of its members. For example, one of Jones's lieutenants, David Nunley, testified about an informal bond-posting policy wherein Jones, or another Enterprise leader, would post bond in the event an Enterprise member was arrested, but only if the arrest was related to Enterprise activity. If, instead, a member was arrested for a crime that was not related to the affairs of the Enterprise, bond would not be posted. (Tr. at 326.)

Another indication of the distinction between Enterprise matters and personal matters is Jenkins's testimony that Aaron Harris, a leading member in the Jones Enterprise, attempted to shoot and kill him because of a dispute over territory in the Middle Court. Jenkins stated that despite Harris's attempt on his life, there was no lasting personal animosity between him and Harris because Harris's motive in the shooting was Enterprise-related. (Tr. at 1887–94.) Moreover, Jenkins also stated that it was not unusual for members of rival gangs to socialize, even though they worked for rival drug organizations. (Tr. at 1894, 1978.)

8. This conclusion is illustrated by the following hypothetical: Assume that Fewell accepted Lawrence's romantic overtures while in Thomas's car. Further assume that after Lawrence and Fewell returned to the party, Jones learned of Fewell's infidelity and, in a fit of jealous rage when Fewell ignored his command to go outside with him, murdered her in the same apartment in front of the same witnesses. Under the government's overarching theory of respect, Jones's motive in killing her would be Enterprise-related, even though he was clearly acting in retaliation for her personal acts of disrespect toward him—namely, her infidelity and her refusal to go outside. The government would further claim that Jones had to use violence to respond to Fewell's acts of personal disrespect; otherwise, his position as the Enterprise leader in the eyes of rival drug dealers and members of his own organization would have been diminished. Thus, according to the government's argument, a jury would have sufficient evidence to conclude that Jones's motive satisfied the fifth element of *Concepcion*.

In the court's view, however, no rational fact finder could infer from these hypothetical facts that Jones acted with a VICAR motive—that is, his general purpose in murdering Fewell was to maintain his position as the leader of the Enterprise or to protect its drug turf. In this example, Jones's motive for the murder would be his personal feelings of jealousy, which are wholly unrelated to the drug-trafficking affairs of the Enterprise. In addition, as Fewell was not involved in the P.T. Barnum drug trade, she could not have posed a genuine threat to the Enterprise's objectives or to Jones's position as its leader.

knew he was expected to use violence to address the threat allegedly posed by Lawrence. *See Concepcion*, 983 F.2d at 381; *Dhinsa*, 243 F.3d at 671. For instance, the government attempts to portray Lawrence's response to Jones as one of aggressive defiance, *see* Tr. at 3205 (contending that Lawrence challenged Jones "by refusing his order to go outside of the apartment [and] by slapping Luke Jones's hands aside"), but this characterization of the evidence is inconsistent with the testimony of the government's own eye-witnesses, Corwell and Jackson, who described Lawrence's resistance to Jones as defensive rather than offensive. These witnesses stated that when Lawrence was shot, he was "half sitting, half standing . . . trying to get away [from Jones]." (Tr. at 804.) Even though Lawrence told Jones that he "ain't going nowhere" and resisted him physically by "snatch[ing] his arm away" in an effort to sit back down (Tr. at 803, 1025), Corwell testified that Lawrence neither touched nor grabbed Jones. (Tr. at 803, 804, 816.) Similarly, while Jackson testified that Lawrence touched Jones's arms at one point, Jackson said Lawrence's purpose for doing so was "to stop [Jones] from pulling him towards [Jones]." (Tr. at 1026, 1059.)

The government also argues that the jury could reasonably infer that Jones's act of violence was Enterprise-related because Jackson and Jamal, two employees of Jones's drug Enterprise, accompanied Jones to the apartment and were present when he shot Lawrence.[9] But such an inference is unreasonable because it is piled on top of the government's central, factually unsupported inference that Jones was required to respond violently to all acts of disrespect, whether personal in nature or Enterprise-related. A jury could not infer a VICAR motive from the fact that Jackson and Jamal accompanied Jones to the apartment and witnessed the murder unless it adopted this key, unsubstantiated inference. Moreover, even if a jury were to draw this unwarranted inference about Jones's generalized need for violence on behalf of the Enterprise, the facts do not allow the further inference that Jones acted with a VICAR motive when he killed Lawrence. For example, when Jones asked Jackson to ride with him to the apartment, Jones did not tell Jackson where they were going or why. (Tr. at 1023.) Jones also told Jackson the day after the Lawrence murder that he should "[g]o back to P.T. You ain't got nothing to do with this [murder], go back to P.T." (Tr. at 1034.) Similarly, the fact that Jamal kicked Lawrence in the head as he lay bleeding on the floor does not permit a reasonable inference that Jones's motive for the murder was related to the Enterprise's affairs. (Tr. at 874.)

Lastly, the court finds that a reasonable jury could not infer that Jones was acting with a VICAR motive solely from the statements he made to Estrada gang members claiming credit for the Lawrence murder and ordering them to remain silent about it. (Tr. at 2179.) Although a jury

9. The government also contends that Jones's Enterprise-related motive can be inferred from the fact that he killed Lawrence in front of P.T. Barnum residents at the party. *See* Tr. at 3207 (government's argument that "[i]f word got out and people in that apartment knew who Luke Jones was, including Kevin Jackson, Jamal Fewell and the other witnesses in there . . . that Luke Jones sort of laughed this off or didn't pay any mind to Mr. Lawrence's disrespect . . . that would have eroded Mr. Jones' reputation for violence, a reputation which we know from all of the witnesses taken into context was integral to the success of this conspiracy"). For the same reasons provided above, this argument fails because it is based solely on inferences drawn from the government's invalid theory of respect.

might permissibly infer that Jones used the murder of Lawrence as a way of intimidating the Estrada gang, his statements alone do not support an inference that Jones was acting with a VICAR motive when he actually killed Lawrence. In order to draw such an inference about Jones's alleged VICAR motive from these statements, the jury would still need a factual basis to support the key inference that Jones's position in the Enterprise required him to act with violence in response to non-Enterprise-related acts of disrespect. But as discussed previously, this crucial inference is without factual support in the trial record. Thus, in the absence of such critical evidence, Jones's *post hoc* comments to the Estrada gang, by themselves, are insufficient to support a finding that Jones was acting with the requisite Enterprise-related motive when he murdered Lawrence.

### 3. *United States v. Thai*

Finally, the court's ruling is consistent with *United States v. Thai*, 29 F.3d 785, 797 (2d Cir.1994), wherein the Second Circuit found that the evidence was insufficient to prove the fifth element of *Concepcion*. In *Thai*, the defendant was the leader of a Vietnamese street gang named "Born To Kill" ("BTK") based in New York City's Chinatown. The gang committed violent crimes, principally robbery and extortion, against Asian-owned businesses such as grocery stores, restaurants, and jewelers. At one point, an unnamed party offered Thai $10,000 to detonate a bomb at a Chinatown restaurant. At Thai's instruction, a gang associate bombed the restaurant; only later did Thai learn that the unnamed party had given him the name of the wrong restaurant. As a result, Thai enlisted other gang members to carry out a second bombing against the intended restaurant. The gang members were arrested as they approached the restaurant, and Thai was charged with conspiracy to commit murder under VICAR. A jury convicted him of that charge. *Id.* at 799.

The Second Circuit, however, reversed on sufficiency grounds, holding that there was no evidence from which the jury could have concluded that Thai's motive for bombing the restaurant was to maintain or increase his position in the BTK enterprise or in response to a threat thereto. Rather, the evidence only showed that his motive was "purely mercenary." *Id.* at 818. Further, because the sole evidence substantiating Thai's alleged motive for the VICAR conspiracy was that "somebody offer[ed] [Thai] big amount of money to do it," *id.*, the Second Circuit held:

> We do not see in this testimony any implication of a motive of the sort envisioned by § 1959. There was no evidence, for example, that the bombing was to be a *response to any threat to the BTK organization or to Thai's position as BTK's leader,* nor any evidence that he thought that as a leader he would be expected to bomb the restaurant. And though Thai paid the expenses of gang members, any suggestion that he undertook to bomb the [restaurant] to obtain money in order to carry out that responsibility would be *entirely speculative,* since the government concedes that there was no evidence as to Thai's intended use of the money.

*Id.* (emphasis added). Significantly, the Second Circuit rejected the government's broad motive theory that since "[t]he gang's purpose was to earn money by committing crimes of violence against Asians," the jury could properly "find that this crime, like all the others, was intended to maintain and enhance Thai's role in the charged enterprise—the leader of a violent gang that victimized Asians for profit." *Id.* at 818.

The Second Circuit was also unpersuaded that a reasonable inference from the commission of the first bombing was that Thai carried out the second bombing to maintain his position in the gang. There simply was no evidence connecting the first bombing to Thai's decision to undertake the second bombing. *Id.* The government provided no testimony that gang members expressed concerns about, or considered questioning, Thai's leadership in light of the erroneous first bombing. *Id.* Given the absence of evidence regarding Thai's motive, the Second Circuit held:

> *Given the lack of evidence,* we believe that any link between the initial bombing and the conclusion that Thai was motivated to accept the second bombing assignment by a desire to maintain or increase his position *would have to have been based on pure speculation.* While a defendant's § 1959 conviction is to be affirmed if a motivation to maintain or increase his position may be reasonably inferred from the evidence, such a conviction may not be affirmed where, as here, *that inference is based on no more than guesswork.*

*Id.* at 818–19 (emphasis added).

Here, as in *Thai,* nothing in the record supports "any implication of a motive of the sort envisioned by § 1959." *Id.* at 818. As previously discussed, the government relies on the evidence that Jones and Enterprise members did not tolerate acts of disrespect from rival drug dealers that affected, or could affect, the Enterprise's ability to sell drugs in P.T. Barnum. But the government dramatically and impermissibly expands the breadth of its respect theory by asserting that the jury could infer that Jones perceived all acts of disrespect toward him, whether personal or Enterprise-related, through the prism of his position and membership in the Enter-

prise. Such an expansion of its "respect as motive" theory is not warranted by the evidence and thus does not support an inference that any act of disrespect directed at Jones personally was also an affront or threat to the Enterprise and Jones's leadership position. A proper application of Rule 29 proscribes such speculation.

In sum, the government's theory of VICAR motive essentially ignores the personal nature of Lawrence's allegedly disrespectful conduct and the dearth of evidence that his conduct posed a threat to the Enterprise or to Jones's leadership role. Thus, without any evidence showing that it was generally expected that Jones, or any other Enterprise member, would use violence to retaliate for personal acts of disrespect committed by a stranger to the P.T. Barnum drug trade, the government's theory of VICAR motive and the inferences that it attempts to draw from the evidence in support of such a motive are "based on no more than guesswork." *Thai,* 29 F.3d at 817. Under *Thai,* a reasonable jury could not permissibly infer from the government's evidence that Jones used violence against Lawrence either to further the objectives of the Enterprise or because Jones knew it was expected of him and that his failure to react violently would have undermined his position in the Enterprise. *See also Dhinsa,* 243 F.3d at 671.

For all of the foregoing reasons, the court holds that the evidence is insufficient to allow a reasonable jury to infer that Jones's general purpose in murdering Lawrence was to maintain or increase his position in the Enterprise.

### CONCLUSION

For the reasons discussed above, Jones's motion for judgment of acquittal [doc.

# 1542] is hereby GRANTED.[10]

---

**10.**  Despite its ruling, the court recognizes the frustration that the Lawrence family must feel. The court also commends the government's desire to hold Jones accountable for a violent murder that this court, based on the trial evidence, is convinced he committed. Consequently, the court hereby directs that the Office of the United States Attorney for the District of Connecticut transmit to the State's Attorney for the Judicial District of Fairfield at Bridgeport a copy of the portion of the trial record relevant to the Lawrence murder. Hopefully, state authorities will utilize this record to initiate further criminal proceedings against this defendant.