**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 8, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

ERIC KAMAHELE,

        Defendant - Appellant.

No. 12-4003

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

DANIEL MAUMAU,

        Defendant - Appellant.

No. 12-4005

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

KEPA MAUMAU,

        Defendant - Appellant.

No. 12-4007

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

SITAMIPA TOKI,

        Defendant - Appellant.

No. 12-4015

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

MATAIKA TUAI,

        Defendant-Appellant.

No. 12-4039

**Appeals from the United States District Court
for the District of Utah
(D.C. Nos. 2:08-CR-00758-TC-SA-1, 2:08-CR-00758-TC-SA-10
2:08-CR-00758-TC-SA-11, 2:08-CR-00758-TC-SA-14
and 2:08-CR-00758-TC-SA-2)**

Diana Hagen Assistant United States Attorney (David B. Barlow, United States Attorney for the District of Utah, Salt Lake City, UT, on the brief) for Plaintiff-Appellee United States of America.

Julie George, Salt Lake City, UT, on the brief for Defendant-Appellant Eric Kamahele.

2

G. Fred Metos, McCaughey & Metos, Salt Lake City, UT, for Defendant-Appellant Daniel Maumau.

Gregory W. Stevens, Salt Lake City, UT, for Defendant-Appellant Kepa Maumau.

Richard P. Mauro, Salt Lake City, UT, for Defendant-Appellant Sitamipa Toki.

David V. Finlayson, Finlayson & Osburn, LLP, Salt Lake City, UT, for Defendant-Appellant Mataika Tuai.

---

Before **TYMKOVICH**, **HOLMES**, and **BACHARACH**, Circuit Judges.

---

**BACHARACH**, Circuit Judge.

---

Mr. Eric Kamahele, Mr. Daniel Maumau, Mr. Kepa Maumau,[1] Mr. Sitamipa Toki, and Mr. Mataika Tuai appeal their convictions arising from armed robberies and shootings in connection with the Tongan Crips Gang ("TCG") in Glendale, Utah. In a jury trial, Mr. Kamahele, Mr. Kepa Maumau, and Mr. Tuai were found guilty of conspiring to commit a racketeering offense under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (2006). Mr. Eric Kamahele, Mr. Daniel Maumau, Mr. Kepa Maumau, and Mr. Sitamipa Toki were found guilty of committing violent crimes in aid of racketeering activity ("VICAR"), 18 U.S.C. § 1959(a) (2006). Mr. Kamahele, Mr.

---

[1] Mr. Daniel Maumau is Mr. Kepa Maumau's older brother. To avoid confusion, we will refer to each by their full name.

3

Kepa Maumau, and Mr. Tuai were also found guilty of violating the Hobbs Act, 18 U.S.C. § 1951(a) (2006). And all were found guilty of violating 18 U.S.C. § 924(c) (2006), for using guns during their respective crimes.

All of the defendants contend the district court erred by: (1) admitting expert testimony by Mr. Break Merino about the TCG's history, structure, and activities, and (2) denying their motions for a judgment of acquittal under Federal Rule of Criminal Procedure 29 based on the Government's failure to prove various elements of RICO and VICAR.

Four defendants also raise individual claims:

- Mr. Daniel Maumau contends the district court erred in its instruction to the jury on VICAR, selecting the jury, and deciding the appropriate sentence.

- Mr. Tuai contends the district court erred in instructing the jury on RICO.

- Mr. Kepa Maumau argues the district court erred by admitting evidence of identification from a photo array that was unduly suggestive.

- Mr. Kamahele alleges prosecutorial misconduct.

Rejecting all of the Defendants' arguments, we affirm.

## I.    Factual Background

To address the Defendants' appeal points, we must understand the TCG's structure and history, as well as the underlying crimes that were alleged.

*A.    Tongan Crips Gang's Structure and History*

4

The TCG is part of the Crips gang that began in California and made its way to the Tongan community in Glendale, Utah. The Glendale chapter of TCG organizes through "generations," which are roughly equivalent to high-school age groups. The gang is also loosely organized by "families," which are signified by monikers such as "Loc," "Dog," and "Down."

Gang members are initiated into TCG by being "jumped in" (when the recruit fights gang members to prove his toughness) or "blessed in" (when the recruit has already proven himself as tough, either by being related to a TCG member or by his criminal reputation). Once initiated, gang members show their association with TCG through certain insignia. For example, members wear blue bandanas, solid-blue clothing, the number 104 (the last three digits of Glendale's zip code), and TCG tattoos (such as "Almighty T Gang"). Gang members also make "T" and "C" hand signs.

The gang adheres to principles such as the values of toughness and loyalty. Gang members must maintain a tough reputation by fighting and committing crimes (called "putting in work"). The gang values not only toughness, but also loyalty. Thus, TCG disapproves of "snitching" (giving information to police or rival gang members) and "hood jumping" (quitting TCG to become a member of another gang).

When the Utah gang formed in the 1990s, TCG members stole beer and fought. As time passed, TCG members continued to steal beer, but advanced to more serious crimes such as armed robberies and assaults.

*B.    Specific Crimes*

At trial, the Government focused on a series of crimes: a shooting at the Faamausili home, a parking-garage robbery, a robbery of a clothing store, two restaurant robberies, and the robbery of a Wal-Mart.

1.    Shooting at the Faamausili Home

In 2007, Mr. Toki and Mele Faamausili were having intercourse in a car when they were confronted by Mele's family. Upset by this discovery, Mele's cousin (Magic) punched Mr. Toki in the face. Mr. Toki jumped out of the car to fight Magic, but Mele's family left before the altercation could escalate.

Mr. Toki, still with Mele, rounded up two fellow TCG members (Mr. Daniel Maumau and Mr. David Kamoto) to "apologize" to Mele's family. Once they arrived at the Faamausili home, the three men shot at the home and into a carport where the Faamausili family was partying. During the shooting, Mr. Daniel Maumau and Mr. Kamoto wore blue bandanas over their faces.

Police later showed Mele a photo array of possible suspects, and she identified the shooters as Mr. Daniel Maumau and Mr. Kamoto.

6

### 2. Republic Parking Garage Robbery

In 2008, Mr. Kamahele and two accomplices robbed a cashier in a Republic Parking Garage ticket booth. The three men donned blue bandanas and pulled up in a tan Cadillac Escalade as the cashier was counting money. The men showed the cashier a sawed-off shotgun and demanded money, and the cashier turned over his credit cards and a manila envelope containing coins.

Approximately 30 minutes later, police discovered a Cadillac Escalade matching the cashier's description parked outside a home with Mr. Kamahele and others nearby. After being driven to the home by police, the cashier identified Mr. Kamahele as one of the robbers. Officers patted down Mr. Kamahele and discovered a manila envelope with coins, similar to the envelope stolen from the cashier. Police also found a sawed-off shotgun inside the Cadillac and the cashier's cards scattered nearby.

### 3. Gen X Clothing Store Robbery

Later in 2008, Mr. Kepa Maumau and another gang member (Mr. Edward Kamoto) robbed a Gen X clothing store in South Ogden, Utah. During the robbery, which took approximately one minute, Mr. Kepa Maumau partially covered his face with his shirt and carried a gun. Of the three store employees who were present during the robbery, two later viewed a photo array and identified Mr. Kepa Maumau as one of the robbers.

7

### 4. El Pollo Loco and Jack in the Box Robberies

After robbing the Gen X Clothing store, Mr. Kepa Maumau and Mr. Kamoto went to Tempe, Arizona, and robbed an El Pollo Loco restaurant. Wielding a gun, the two took money from the cash register.

Mr. Kepa Maumau and Mr. Kamoto then robbed a Jack in the Box restaurant down the street. While fleeing the robbery, they encountered a couple leaving a nearby restaurant, who noticed that the robbers were wearing blue bandanas. After being chased by police for two miles, Mr. Kepa Maumau crashed the car. He and Mr. Kamoto tried to run, but were detained and arrested by police. After the arrest, police learned that the car was registered to Mr. Kepa Maumau and matched the witnesses' description. Inside were papers bearing Mr. Kepa Maumau's name, a document titled "Exit Plan," and a loaded gun. The "Exit Plan" described Mr. Kepa Maumau's involvement with TCG.

After his arrest, Mr. Kamoto pled guilty to robbery charges in Arizona state court and served eighteen months in an Arizona county jail. After his release, he returned to Utah with an enhanced reputation among his fellow TCG members because of his participation in these robberies.

### 5. Wal-Mart Robbery

In 2008, Mr. Latutaofieiki Fakaosiula, Mr. Kamahele, Mr. Tuai, Mr. Vainga Kinikini, and Mr. Tevita Tolutau attempted to rob a Wal-Mart Super Store in Riverton, Utah. At the time, Mr. Kinikini was a Wal-Mart employee. Using information obtained as an employee, Mr. Kinikini orchestrated the robbery plan. Essentially, the plan called for Mr. Kamahele and Mr. Tuai to arm themselves, enter the office where the money was held, and steal the proceeds.

The plan went badly. Mr. Kamahele and Mr. Tuai were able to enter the Wal-Mart office, but could not go into the area where the money was kept. Mr. Kamahele abandoned the plan, and the men fled.

Shortly thereafter, Mr. Kinikini and Mr. Fakaosiula confessed. According to Mr. Fakaosiula, Mr. Tuai and Mr. Kamahele discussed giving some of the robbery proceeds either to family members of incarcerated TCG members or to fund a drug-dealing operation. Mr. Kinikini denied such a plan, stating that the robbers were going to split the proceeds among themselves.

While in jail, Mr. Kamahele and Mr. Tuai attacked Mr. Fakaosiula and Mr. Kinikini in retaliation for "snitching."

Approximately one month after the Wal-Mart robbery, Mr. Kamahele stated in a recorded jailhouse telephone conversation that he did not intend to stop "putting in work" and that he needed "at least three."

9

## II. Procedural Background

The Defendants were charged under one or more of four statutes:

- 18 U.S.C. § 1962(d) (2006), conspiracy to commit a racketeering offense,

- 18 U.S.C. § 1959(a) (2006), violent crimes in aid of racketeering,

- 18 U.S.C. § 1951(a) (2006), Hobbs Act Robbery, and

- 18 U.S.C. § 924(c) (2006), using a gun during a crime of violence.

Mr. Kamahele, Mr. Kepa Maumau, and Mr. Tuai were convicted on the charges involving a RICO conspiracy. On these charges, the jury identified five of the robberies as racketeering acts committed as part of this conspiracy: the robberies of the Republic Parking Garage, the Gen X Clothing Store, the El Pollo Loco, the Jack in the Box, and the Wal-Mart.

Mr. Kepa Maumau was convicted on eight counts. For his part in the Gen X robbery, Mr. Kepa Maumau was found guilty on one VICAR count, one Hobbs Act count, and one § 924(c) count. For the El Pollo Loco and Jack in the Box robberies, Mr. Kepa Maumau was found guilty of two more VICAR counts and two more § 924(c) counts.

Likewise, Mr. Tuai and Mr. Kamahele were found guilty on one Hobbs Act count and one § 924(c) count arising from their participation in the Wal-Mart robbery. Mr. Kamahele was also found guilty of additional VICAR and

10

§ 924(c) counts arising from the Republic Parking Garage robbery.  Finally, the jury found Mr. Daniel Maumau and Mr. Toki guilty on one VICAR count and one § 924(c) count arising from their involvement in the shooting at the Faamausili home.

### III.    Incorporation of Arguments by Codefendants

Mr. Daniel Maumau and Mr. Kamahele attempted to broadly adopt their codefendants' arguments under Fed. R. App. P. 28(i).  But they were too general in what they wanted to adopt.  For example, Mr. Daniel Maumau stated:  "To the extent that they are applicable to his case [he] joins and incorporates by reference the arguments raised" in the appeals by Mr. Tuai, Mr. Kepa Maumau, Mr. Toki, and Mr. Kamahele.  Daniel Maumau's Opening Br. at 54.  And Mr. Kamahele wrote that he was joining his codefendants' arguments involving the jury instructions, admissibility of expert testimony, and "application of the Enterprise to the defendants."  Kamahele's Opening Br. at 26.

From these descriptions, the Court would have to:  (1) guess which arguments applied to Mr. Daniel Maumau, and (2) review all of the Defendants' briefs to discern which parts were being adopted by Mr. Kamahele.  We decline "to sift through the briefing . . . and imagine which arguments might apply to" Mr. Daniel Maumau and Mr. Kamahele.  *United States v. Renteria*, 720 F.3d 1245, 1251 (10th Cir. 2013).  As a result, we will not allow Mr. Daniel Maumau and Mr. Kamahele to adopt (without specificity) their codefendants' arguments.

11

## IV. Issues Relating to All Defendants

Two of the appellate issues relate to all of the defendants: (1) introduction of opinion testimony by the Government's gang expert, and (2) denial of the motions for a judgment of acquittal. On these issues, we reject the Defendants' arguments.

### A. *Officer Merino's Expert Testimony*

At trial, the Government called Officer Break Merino to testify as an expert on the Tongan Crips Gang.[2] This testimony covered:

- TCG's history and structure,

- TCG's insignia, such as tattoos, hand signs, and clothing,

- Tongan culture, and

- TCG's criminal activities, including shootings, stabbings, thefts, and car jackings.

Officer Merino also testified that each defendant was a member of TCG.

Before and during the trial, the Defendants raised three objections to Officer Merino's testimony: (1) The testimony was not needed for the jury to understand TCG; (2) Officer Merino's methodology was unreliable; and (3) introduction of the testimony violated the Confrontation Clause because the officer simply repeated inadmissible hearsay. The district court overruled these objections. On

---

[2] He also testified as a fact witness regarding an interview conducted with Daniel Maumau. *See* Tuai R. vol. 3, pt. 17, at 3242-60. But this appeal involves the officer's expert testimony rather than his fact testimony.

appeal, the Defendants assert the same three errors regarding Officer Merino's testimony.

Reviewing for an abuse of discretion,[3] we reject the Defendants' first two arguments. We reject the first because the district court could reasonably conclude that an average juror would not know how TCG operated. We reject the second because the district court could reasonably conclude that Officer Merino relied on multiple sources and filtered the information through his expertise.

Engaging in de novo review,[4] we reject the third contention because Officer Merino did not simply repeat information obtained from outside sources.

Accordingly, we affirm the district court's admission of Officer Merino's expert testimony.

### 1.    Officer Merino's Testimony Was Helpful to the Jury

Mr. Kepa Maumau argues that Officer Merino's testimony "went far beyond interpreting gang signs, discussing clothing, or explaining organizational

---

[3]    We review the district court's admission of Officer Merino's testimony for an abuse of discretion. *See United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011). In this situation, we reverse only if: (1) the district court's ruling is "'arbitrary, capricious, whimsical or manifestly unreasonable,'" or (2) the district court "'made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012) (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)).

[4]    *See United States v. Townley*, 472 F.3d 1267, 1271 (10th Cir. 2007) (noting that we review de novo the district court's treatment of the claim involving the Confrontation Clause).

13

hierarchy" and "essentially summarize[d] the factual investigation of TCG." Kepa

Maumau's Opening Br. at 33-34.[5] According to Mr. Kepa Maumau and three

other defendants, this "summary" cannot constitute proper expert testimony under

Federal Rule of Evidence 702 because jurors do not need an expert's opinion to

understand evidence about TCG. But we have recognized that expert testimony

regarding gang activity is appropriate under Rule 702; thus, we reject the

Defendants' argument.

Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2011).[6]

This rule applies to experts beyond those in the field of science. And we

have long recognized that police officers can testify as experts based on their

experience "[b]ecause the average juror is often innocent of the ways of the

criminal underworld." *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir.

---

[5] Mr. Daniel Maumau also argued that the district court abused its discretion in admitting Officer Merino's testimony, which Mr. Toki and Mr. Tuai join.

[6] We use the 2011 version here because that is the version that applied in the trial, which took place in September 2011.

2011); *see also United States v. Roach*, 582 F.3d 1192, 1206 (10th Cir. 2009)

("We have allowed police to testify as experts under Rule 702 on many

occasions."). Thus, we have upheld officer–expert testimony regarding use of a

strawman to buy guns,[7] means and methods of drug dealing,[8] and participation in

gang activity.[9]

Under these decisions, the district court had the discretion to regard Officer

Merino's testimony as helpful to the jury. For example, the district court could

have believed the jury would benefit from Officer Merino's expertise about TCG's

structure, insignia, and history. And the district court could have assumed that a

typical juror would lack knowledge of the gang terminology and the significance

---

[7]   *See United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011) (noting that the "average juror is as likely to be unaware of the dynamics of the illicit arms trade as of the trade in narcotics").

[8]   *See United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009) (discussing the use of guns in the drug trade); *see also United States v. Quintana*, 70 F.3d 1167, 1170-71 (10th Cir. 1995) (explaining terminology used by drug traffickers); *United States v. Sturmoski*, 971 F.2d 452, 459 (10th Cir. 1992) (explaining methamphetamine labs and the use of guns in these labs); *United States v. McDonald*, 933 F.2d 1519, 1520-23 (10th Cir. 1991) (explaining the significance of certain quantities and packaging of cocaine, as well as the exchange of drugs for food coupons); *United States v. Harris*, 903 F.2d 770, 775-76 (10th Cir. 1990) (discussing characteristics of documents used in drug enterprises).

[9]   *See United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013) ("[W]e have affirmed district courts' admission of gang-expert testimony as helpful to a jury when a defendant is a gang member."); *United States v. Hartsfield*, 976 F.2d 1349, 1352-53 (10th Cir. 1992) (upholding the government's use of an officer–expert's testimony regarding the Black Mafia Crip Dawgs's objective of distributing cocaine and crack cocaine).

15

of TCG insignia. Accordingly, the district court had the discretion to regard Officer Merino's testimony as helpful to the jury.[10]

### 2. Officer Merino's Methods Were Sufficiently Reliable

The Defendants also argue that Officer Merino's testimony was not reliable under Rule 702.[11] *E.g.*, Toki's Opening Br. at 40-41; Daniel Maumau's Opening Br. at 42-45. We disagree, for Officer Merino relied on multiple sources and verified his information whenever possible.

Officer Merino based his expert testimony on years of experience, adding that he filtered information from numerous sources based on his experience in the Glendale school system and as a law enforcement officer. Tuai R. vol. 3, pt. 20, at 3844-45. The district court did not clearly err in finding that Officer Merino had based his conclusions on his "expertise, derived over many years and from multiple sources." *Id.* vol. 1, pt. 3, at 685.

---

[10] We recently rejected a similar argument in *United States v. Archuleta*, 737 F.3d 1287 (10th Cir. 2013). There we held that an officer–expert's testimony regarding the Sureños Tortilla Flats gang did not violate Rule 702 because the expert's testimony assisted the jury. We reasoned that the expert's testimony provided context to the jury. *Id.* at 1296-97.

[11] Stray comments in the Defendants' briefs also appear to question Officer Merino's qualifications. *E.g.*, Daniel Maumau's Opening Br. at 42 (noting that "[t]here was nothing to indicate that Officer Merino had taken any courses or received any training beyond a high school education and military and police officer training"). But the Defendants do not appear to challenge the district court's ruling that Officer Merino could offer expert opinion testimony.

16

a.      *United States v. Mejia*

The Defendants rely heavily on a case in the Second Circuit Court of Appeals, *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008).  There the officer–expert identified various crimes committed by MS-13 gang members.  The Second Circuit Court of Appeals concluded that the officer–expert's testimony "impermissibl[y] substitut[ed]" factual evidence by "simply disgorg[ing] [his] factual knowledge to the jury" to "satisfy the elements of the charged offense." *United States v. Mejia*, 545 F.3d 179, 191 (2d Cir. 2008).

Officer Merino's testimony differs from the officer's testimony in *Mejia*. Unlike the *Mejia* expert, Officer Merino based his testimony on his accumulation of information from multiple sources, which he then filtered and analyzed based on his TCG expertise.  *See id*. at 197 (noting that testimony "synthesi[zing] . . . various source materials" constituted proper expert testimony); *United States v. Johnson*, 587 F.3d 625, 636 (4th Cir. 2009) (distinguishing *Mejia* because the expert witnesses in *Johnson* were applying their expertise rather than simply passing "along an important testimonial fact . . . learned from a particular interview").  And in testifying about this analysis, Officer Merino described this progression in criminality not in terms of specific crimes (as in *Mejia*), but in generalities to explain the context in which TCG operated.

17

The Defendants' reading of *Mejia* is overly broad. And even if this reading of *Mejia* were correct, we would be required to apply our own precedents, which have upheld expert testimony similar to Officer Merino's.

b.    Need for a Scientific Methodology

The Defendants argue that Officer Merino's testimony violated Rule 702 because it was not based on scientific methodology. But we have elsewhere rejected similar arguments. *See, e.g.*, *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009) (rejecting the defendant's argument that the officer–expert's testimony was unreliable because "no conceivable 'science' could illuminate" the subject matter of the expert's testimony and "recognizing that police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters as the use of firearms in the drug trade").

The district court allowed Officer Merino's testimony after finding that it helped the jury by providing insights into the distinctive traits of TCG, a topic beyond the knowledge of most jurors. This ruling fell within the district court's discretion; accordingly, we reject the Defendants' arguments based on Rule 702.

3. The Introduction of Officer Merino's Expert Testimony Did Not Violate the Confrontation Clause

Defendants Kepa Maumau, Daniel Maumau, and Sitamipa Toki[12] also invoke the Confrontation Clause, arguing that Officer Merino based his testimony on interviews with cooperating witnesses and other gang members. We disagree. Introduction of expert testimony violates the Confrontation Clause only when the expert is simply parroting a testimonial fact. That did not occur here.

Under the Sixth Amendment's Confrontation Clause, a criminal defendant enjoys "the right . . . to be confronted with the witnesses against him." U.S. Const. art. VI. This right has been refined in Supreme Court precedent. For example, in *Crawford v. Washington*, the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53-54 (2004). "Testimonial statements" include statements taken by police officers in the course of interrogations or given by a confidential informant. *See United States v. Lopez-Medina*, 596 F.3d 716, 730 (10th Cir. 2010).

Introduction of a testimonial statement is unconstitutional only when it is offered to prove the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9.

_____

[12] Mr. Tuai joins in his codefendants' Confrontation Clause argument. Tuai's Opening Br. at 47.

19

We have stated that a "prime example of where an out-of-court statement might be admitted for a purpose other than to establish its substantive truth . . . is when an expert witness testifies regarding the out-of-court development of facts or data on which the expert's opinions were based." *United States v. Pablo*, 696 F.3d 1280, 1287-88 (10th Cir. 2012).

Introduction of opinion testimony does not violate the Confrontation Clause when the experts rely on their independent judgment—even when this independent judgment is based on inadmissible evidence. *United States v. Johnson*, 587 F.3d 625, 634-35 (4th Cir. 2009). But if the expert is simply "parrot[ing] 'out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion,'" the testimony would be inadmissible. *Id*. at 635 (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)). The distinction between the two "is a question of degree." *Pablo*, 696 F.3d at 1288. Accordingly, we must determine whether Officer Merino was: (1) basing his opinion on his independent judgment, or (2) simply "parroting" testimonial hearsay.

Mr. Daniel Maumau, Mr. Kepa Maumau, and Mr. Toki generally describe Officer Merino's testimony, but they do not identify the parts that involved the recitation of testimonial hearsay. *See* Daniel Maumau's Opening Br. at 49-50 (stating, without any supporting citation, that "Merino simply parroted information" received from others); Kepa Maumau's Opening Br. at 37 (claiming,

20

without any supporting citation, that "the District Court allowed Officer Merino merely to parrot the statements of his[] alleged sources, with no opportunity for cross-examination, rather than conveying independent judgment"); Toki's Opening Br. at 39-40 (citing passages in Officer Merino's testimony as inflammatory, but failing to identify the parts that violated the Confrontation Clause).

Without such guidance, we are hard-pressed to find testimony by Officer Merino that simply parroted a testimonial fact learned from a particular interview. Like the district court, we conclude that Officer Merino applied his expertise, formed by years of experience and multiple sources, to provide an independently formed opinion.

4. The Defendants' Statements Implicating Rule 403

Finally, in their opening briefs, the Defendants say that Officer Merino's testimony was "prejudicial." *E.g.*, Toki's Opening Br. at 41-42 (noting that Officer Merino's testimony was found to be unduly prejudicial in an appeal of Mr. Toki's Utah state conviction arising from the same conduct). These references implicate Federal Rule of Evidence 403, which allows the district court to exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice.

Though the Defendants suggest prejudice, they have not briefed the issue in a meaningful way. For example, Mr. Toki mentions a state court decision (where

21

much of Officer Merino's testimony was considered inadmissible) and referred once to Rule 403. Toki's Opening Br. at 41-42 & n.22. But Rule 403 is never discussed in the brief. Similarly, Mr. Tuai refers to Rule 403 in a heading and introduction, but fails to discuss the rule. Tuai's Opening Br. at 47. Because the Defendants did not sufficiently brief an appellate argument under Rule 403, we decline to address the Defendants' characterization of the expert testimony as "prejudicial." *See United States v. Banks*, 451 F.3d 721, 728 (10th Cir. 2006).

## B.    *Sufficiency of the Evidence*

Following the close of the evidence, each defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the evidence was insufficient to go to the jury. The district court denied each motion. On appeal, the Defendants renew their challenges to the sufficiency of the evidence. These challenges are rejected.

All defendants contend that the Government failed to show that TCG could constitute a RICO enterprise. We disagree, concluding that the jury could reasonably find an enterprise based on TCG's purpose, the relationships among the members, and the longevity of TCG.

On the RICO conspiracy count, Mr. Kamahele, Mr. Kepa Maumau, and Mr. Tuai contend that the evidence failed to establish a nexus between the enterprise and racketeering activity. We disagree. The testimony allowed a reasonable jury

22

to find that TCG required members to commit crimes, and this requirement could have constituted the required nexus.

Mr. Tuai argues that the evidence did not show that he had agreed to the commission of two or more predicate acts under RICO. But another TCG member testified that Mr. Tuai wanted to "earn stripes" for the gang. From this testimony, the jury could infer that Mr. Tuai joined TCG with knowledge that the gang would commit multiple racketeering acts. Accordingly, Mr. Tuai's argument fails.

On the VICAR counts, Mr. Daniel Maumau, Mr. Kepa Maumau, and Mr. Toki challenge the strength of the evidence that they had committed the violent crimes (the Faamausili home shooting and the robberies of Gen X, El Pollo Loco, and Jack in the Box) to maintain or advance positions within TCG. We disagree.

For the shooting at the Faamausili home, the jury could have inferred this motivation from evidence involving: (1) the manner in which the Defendants committed the offense, (2) their donning of TCG insignia when committing the crimes, and (3) TCG's general purpose of instilling fear in the community. This evidence was sufficient for the jury to find that Mr. Daniel Maumau and Mr. Toki had acted with the purpose of maintaining or advancing their positions within TCG.

For the robberies of Gen X, El Pollo Loco, and Jack in the Box, the jury could infer the required purpose from testimony by Mr. Kepa Maumau's accomplice in these robberies, the "Exit Plan" document (written by Mr. Kepa

23

Maumau and found in his car), and testimony that the two robbers were wearing blue bandanas.

Finally, Mr. Tuai argues that the evidence was insufficient for a finding that he had carried a real gun when robbing Wal-Mart. We reject this argument based on surveillance video, the discovery of a matching gun, and testimony by a victim and an accomplice.

### 1. Standard of Review

We engage in de novo review of the sufficiency of the evidence to support the conviction. *See United States v. Irvin*, 682 F.3d 1254, 1266 (10th Cir. 2012). In conducting this review, we treat the evidence in the light most favorable to the Government and ask whether a rational fact-finder could have concluded beyond a reasonable doubt that the defendant was guilty. *See id.* In addressing this question, we do not weigh conflicting evidence or consider the credibility of witnesses. *See United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004). Instead, we "simply determine 'whether [the] evidence, if believed, would establish each element of the crime.'" *Id.* (quoting *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001)). Reversal is warranted only when no rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *Irvin*, 682 F.3d at 1266.

24

### 2. Sufficiency of the Evidence on the RICO Conspiracy Convictions

Mr. Kamahele, Mr. Kepa Maumau, and Mr. Tuai were found guilty on Count 1, conspiracy to commit a racketeering offense in violation of RICO, 18 U.S.C. §§ 1961-1968 (2006). This law criminalizes conspiracy to violate any of the three substantive RICO provisions. 18 U.S.C. § 1962(d) (2006).

Count 1 alleged conspiracy to violate 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) (2006). A "pattern of racketeering activity" consists of two or more acts of racketeering activity (commonly referred to as "predicate acts"), which are related and "'amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity.'" *Hall v. Witteman*, 584 F.3d 859, 867 (10th Cir. 2009) (quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)).

For the predicate acts, the Government alleged violations of the Utah and Arizona robbery statutes. *See* 18 U.S.C. § 1961(1)(A) (2006) (defining "racketeering activity" as robbery that is "chargeable under State law and punishable by imprisonment for more than one year"); Utah Code § 76-6-301(1)(a)

25

to -(b) (2004) (defining robbery); Ariz. Rev. Stat. § 13-1902(A) (2001) (defining robbery).

The parties agree that the Government had to prove that:

- the defendant knew about the commission of two or more acts that constituted a pattern of racketeering activity, and

- the defendant participated in an enterprise affecting interstate or foreign commerce.[13]

In light of this evidentiary burden, the Defendants make three arguments.

First, Mr. Kamahele, Mr. Kepa Maumau, and Mr. Tuai challenge the sufficiency of the evidence that TCG was an "enterprise."

Second, they question the proof of a nexus between the enterprise and racketeering activity.

Finally, Mr. Tuai contends that the evidence did not show that he had agreed to the commission of two or more predicate acts.

_____

[13]     These elements were identified in *United States v. Smith*, 413 F.3d 1253, 1266 (10th Cir. 2005), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009). After *Smith*, we held that in a prosecution under § 1962(d), the Government need not prove the existence of an enterprise. *United States v. Harris*, 695 F.3d 1125, 1132-33 (10th Cir. 2012). Nonetheless, the district court instructed the jury that the § 1962(d) charge required the existence of an enterprise, and the Government did not object. Thus, the Government concedes that it had to prove the existence of an enterprise. *See United States v. Romero*, 136 F.3d 1268, 1273 (10th Cir. 1998).

a.      Enterprise

Viewing the record in the light most favorable to the Government, we conclude that the evidence sufficed for the jury to find the existence of an enterprise.

(i)      The Requirements of an "Enterprise"

The term "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4) (2006).  An association-in-fact requires:  (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit those associated with the enterprise to pursue the enterprise's purpose.  *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

An enterprise may exist even without a formal hierarchy, chain of command, fixed roles, a name, established rules, initiation ceremonies, or regular meetings.  *Id*. at 948.  To qualify as an enterprise under RICO, the association need only be a "continuing unit that functions with a common purpose."  *Id*.; *see United States v. Turkette*, 452 U.S. 576, 583 (1981) (concluding that an association-in-fact enterprise constitutes a "group of persons associated together for a common purpose of engaging in a course of conduct").

27

(ii)    Purpose

The evidence would have allowed a rational jury to conclude that Mr.
Kamahele, Mr. Kepa Maumau, and Mr. Tuai were members of the gang and acted
to promote its criminal purposes through the robberies of the Wal-Mart, El Pollo
Loco, Jack in the Box, Republic Parking, and Gen X Clothing Store.

The Defendants argue that while TCG was "a street gang drawn together by
connections to their native Tonga and their geographic neighborhood," the
evidence was not sufficient to establish that TCG members associated together
with a common purpose of committing RICO predicates. *See, e.g.*, Kamahele's
Opening Br. at 17.

For this argument, Mr. Kamahele downplays the criminality of the gang by
pointing to its beer thefts, which he characterizes as innocuous youthful
indiscretions rather than the sort of criminality associated with a criminal
enterprise. But the jury was entitled to view the gang in a different way. For
example, the jury could reasonably view the Wal-Mart robbery as a complex
undertaking. The five robbers met to discuss the layout of the store, the location
of security cameras, the amount of money that was accessible ($100,000), the
manner in which the employees would bring the money into the cash room, and the
details of the cash room. The plan was sufficiently complicated to require three
separate meetings. In these meetings, the robbers arranged for a lookout (who
would call Mr. Kamahele and Mr. Tuai when the Wal-Mart employees headed to

28

the cash room), a getaway driver (who would wait outside for Mr. Kamahele and Mr. Tuai), and a Wal-Mart insider (who would enter the Wal-Mart store after the robbery to gain intelligence on the police investigation). With evidence of this planning, the jury could reasonably reject Mr. Kamahele's view that the gang involved only adolescent mischief.

Mr. Kamahele and Mr. Kepa Maumau argue that TCG does not qualify as an enterprise because members were "drawn together by connections to their native Tonga and their geographic neighborhood," Glendale, rather than racketeering purposes. Kamahele's Opening Br. at 17. For this argument, the Defendants point to cases in which the gangs committed drug trafficking, drug dealing, and running prostitution rings. *See United States v. Harris*, 695 F.3d 1125, 1136 (10th Cir. 2012) (holding that Crips gang sets constituted an association-in-fact enterprise when they "jointly operated the houses from which various set members sold drugs"); *United States v. Smith*, 413 F.3d 1253, 1264, 1268 (10th Cir. 2005) (concluding that a gang constituted an enterprise for RICO purposes when the group used drug-distribution proceeds to support the families of fellow gang members), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009); *United States v. Killip*, 819 F.2d 1542, 1545-46, 1549-50 (10th Cir. 1987) (concluding that a chapter of the Outlaws Motorcycle Club constituted a RICO enterprise when the chapter operated a drug-distribution scheme).

The gang here was different because it did not involve drugs or prostitution. But the jury could find that TCG was a continuing unit that functioned for a common purpose: enhancing the gang's reputation by instilling fear through criminal activity and profiting from that activity (either in the form of proceeds or goods from robberies). *See Smith*, 413 F.3d at 1271 (concluding that the purpose element could consist of maintenance of the group's fearsome reputation through acts of violence).

The Defendants argue that because gang members did not pool their money or jointly share in the profits of drug dealing, TCG could not qualify as a RICO enterprise. But economic gain is not required for the existence of an enterprise. *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 261-62 (1994) (holding that "RICO contains no economic motive requirement").

Though the Defendants focus on their Tongan roots, the Government's evidence focused on the criminal purposes of the group that transcended the larger Tongan community. Through this evidence, the Government presented sufficient evidence for the jury to infer an enterprise.

(iii)    Relationships Among Members

The jury could also have inferred relationships among the TCG members. To infer these relationships, jurors could have relied on testimony that TCG members had met and shared TCG insignia, such as tattoos. Similarly, the "Exit Plan" described the gang's shared hostility toward anyone wearing red in the

30

neighborhood (the color associated with a rival gang), stating that TCG gang members "learned to hate anybody that [the] gang didn't get along with[,] . . . a tradition passed down from generation to generation." Kepa Maumau R. vol. 2, pt. 1, at 138-39. The evidence also suggested that gang members committed crimes together and looked out for fellow members. This unity was sufficient on the relationship prong. *See United States v. Harris*, 695 F.3d 1125, 1136 (10th Cir. 2012) (concluding that the "relationship" prong was satisfied when Crips members met, socialized at the "Crip club," and "shar[ed] colors and handshakes").

(iv)    <u>Longevity of the Enterprise</u>

The evidence was also sufficient to establish that TCG had the longevity for an association-in-fact enterprise. For example, the evidence indicated that TCG had begun in the 1990s and spanned multiple "generations" of TCG members. *See* Tuai R. vol. 3, pt. 10, at 1807-08; *see also Harris*, 695 F.3d at 1136 (concluding that the third prong was satisfied when the evidence supported a "pattern of activity . . . over a period of years").

(v)    <u>Summary</u>

Viewing the evidence in the light most favorable to the Government, a reasonable jury could conclude that TCG had a common purpose, relationships, and longevity, as required for an associate-in-fact enterprise.

b.    Nexus Between the Enterprise and Racketeering Activity

The Defendants also argue that the Government failed to present sufficient evidence tying TCG to the robberies of Gen X, El Pollo Loco, Jack in the Box, and Wal-Mart. *E.g.*, Kepa Maumau's Opening Br. at 46. We disagree, for a reasonable jury could connect these robberies and TCG from testimony that: (1) TCG members had to commit crimes to maintain their status in the gang, and (2) the robbers intended to share the Wal-Mart money with other TCG members.

Conduct "'forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985) (quoting 18 U.S.C. § 3575(e)).

The jury could infer a connection between the robberies and the enterprise (TCG). For example, the jury could have relied on testimony by Mr. Kamoto and a recorded statement of Mr. Kamahele. Mr. Kamoto accompanied Mr. Kepa Maumau on three of the robberies. At trial, he stated that TCG members committed robberies to maintain their criminal reputation. And, when Mr. Kamahele was asked whether he would stop committing robbery, he said in a jailhouse conversation that he needed to put in "at least three." From this statement, a jury could reasonably conclude the Defendants had committed the robberies to "earn stripes" and "put in work," a requirement of TCG membership.

32

Mr. Tuai focuses on the Wal-Mart robbery.  But this robbery, like the others, involved two characteristics identified with TCG.

First, while discussing his participation in the Wal-Mart robbery, Mr. Latutaofieiki Fakaosiula testified that he and the other robbers had planned to give part of the stolen money to the families of incarcerated TCG members and possibly to rent a house to distribute marijuana.  Tuai R. vol. 3, pt. 6, at 1059, 1084-85.  Mr. Kamahele argues that Mr. Fakaosiula's testimony was inconsistent with other statements that Mr. Fakaosiula had given to police.  And Mr. Vainga Kinikini testified that no such statements were made by or in front of him regarding the Wal-Mart robbery proceeds.  Tuai R. vol. 3, pt. 7, at 1276-77.  But we cannot weigh the evidence and must view the testimony in the light most favorable to the Government.  *See United States v. Irvin*, 682 F.3d 1254, 1266 (10th Cir. 2012).

Second, Mr. Fakaosiula testified that Mr. Kinikini, Mr. Tuai, and Mr. Kamahele were members of TCG and that Mr. Tuai wanted to commit the Wal-Mart robbery to get "stripes" and "make his name known."  Tuai R. vol. 3, pt. 6, at 1083, 1161.

From Mr. Fakaosiula's testimony, the jury could tie Mr. Tuai's participation in the Wal-Mart robbery to his membership in TCG.

c.      Mr. Tuai's Agreement Involving the Commission of Two Predicate Acts

Finally, Mr. Tuai argues that the evidence was insufficient to establish an agreement for a coconspirator to commit at least two predicate acts, as required to convict him of RICO conspiracy under § 1962(d). For this argument, Mr. Tuai stresses that the jury found him guilty of only one predicate act: the Wal-Mart robbery. We reject Mr. Tuai's argument because the jury could reasonably find that Mr. Tuai had agreed to other predicate acts by himself or by fellow TCG members.

As previously discussed, the Government does not need to prove that each defendant personally committed two predicate acts to prove a RICO conspiracy. *See Salinas v. United States*, 522 U.S. 52, 63 (1997) ("There is no requirement of some overt act or specific act in the [RICO conspiracy] statute . . . ."). And the jury could have inferred that Mr. Tuai agreed to other predicate acts by fellow gang members. In drawing this inference, a juror could point to Mr. Fakaosiula's testimony when he said that Mr. Tuai had wanted to commit the Wal-Mart robbery to get "stripes" and "mak[e] his name known." Tuai R. vol. 3, pt. 6, at 1083, 1161. From this testimony, the jury could have inferred that Mr. Tuai had agreed to commit at least one other racketeering act.

This inference would have been permissible even in the absence of an express agreement for other gang members to commit two specific predicate acts.

34

Even without this level of specificity, the Government can prove an agreement "through 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme,' amounting to evidence that each defendant necessarily must have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering." *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007) (citation omitted) (quoting *United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005)).

The Government presented evidence that Mr. Tuai was a member of TCG and understood the gang's expectations that members commit crimes. There was also evidence that supported an inference that his membership in TCG predated the commission of the other predicate acts the jury found on Count 1. From this evidence, a reasonable jury could have concluded that Mr. Tuai, by joining TCG and participating in its affairs, agreed to the commission of two or more predicate acts. *See Smith*, 413 F.3d at 1272.

Mr. Tuai could have been guilty even if the jury had inferred an agreement for others to commit more crimes. As previously noted, the Government's evidence indicated that gang members had to earn "stripes," which involved crimes. And in a jailhouse call, Mr. Kamahele stated he had to get at least three stripes. A jury could reasonably infer that Mr. Tuai recognized a need for the gang to commit at least one more crime besides the Wal-Mart robbery. Thus, the evidence sufficed on Mr. Tuai's conviction for RICO conspiracy.

35

3.     Sufficiency of the Evidence on the VICAR Convictions

Mr. Daniel Maumau, Mr. Kepa Maumau, and Mr. Sitamipa Toki argue that the evidence was insufficient under VICAR, 18 U.S.C. § 1959(a) (2006), which prohibited violent crimes in aid of racketeering activity.  The Defendants assert two grounds for their argument:  (1) TCG does not constitute an enterprise; and (2) the Government did not establish that the three defendants had committed the underlying crimes to maintain or advance their positions within TCG.  As discussed above, the evidence was sufficient to infer the existence of an enterprise.  We also conclude that the jury reasonably could have connected the crimes to the enterprise (TCG).  This connection could have arisen from:  (1) the manner in which the crimes were committed, including the TCG insignia worn during the shooting and the robberies, and (2) the expectations for TCG members to commit crimes.

To establish a VICAR conviction, the Government had to prove that:  (1) TCG was an enterprise within the meaning of RICO, (2) TCG engaged in racketeering activity, (3) the defendant was a member of TCG, (4) the defendant committed the predicate violent crime, and (5) "his general purpose in doing so was to maintain or increase his position in [TCG]." *United States v. Smith*, 413 F.3d 1253, 1277 (10th Cir. 2005), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009).

36

Mr. Daniel Maumau, Mr. Kepa Maumau, and Mr. Sitamipa Toki challenge the first and fifth elements, arguing that the Government failed to prove that TCG was an enterprise and that the Defendants had intended to maintain or enhance their positions within the gang. We reject these challenges.

a. The Existence of an "Enterprise"

We have elsewhere concluded that the Government presented sufficient evidence for the jury to regard TCG as an "enterprise" under RICO. The same reasoning would have allowed the jury to find an "enterprise" under VICAR.[14]

b. Connection Between the Violent Crimes and the Enterprise (TCG)

Accordingly, we address the Defendants' contention that the Government failed to prove the fifth VICAR element: that they committed the underlying violent predicate to maintain or advance their positions within TCG.

---

[14] A VICAR "enterprise" includes "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2) (2006). As previously discussed, RICO similarly defines "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (2006). Perhaps because of the similarity in the definitions, the parties do not suggest any differences in the assessment of an "enterprise" under VICAR and RICO. *See United States v. Phillips*, 239 F.3d 829, 843 (7th Cir. 2001) ("[C]ases decided under [RICO] may also be used to determine what constitutes an enterprise under [VICAR].").

(i) Faamausili-Home Shooting

Mr. Daniel Maumau and Mr. Toki challenge the sufficiency of the evidence arising from the shooting into the Faamausili home. In challenging the sufficiency of the evidence, they argue that the Government failed to prove that they had acted with the purpose of maintaining or increasing their positions within the enterprise. According to the Defendants, the shooting was personal.

We conclude that three factors support the jury's conclusion that the shooting was to further or maintain the Defendants' positions in TCG: (1) Mr. Toki enlisted two of his fellow gang members to retaliate; (2) during the commission of the shooting, Mr. Daniel Maumau and Mr. Kamoto donned blue bandanas, which were insignia of TCG; and (3) the shooting was in broad daylight, suggesting that the shooters wanted the family and others to know that TCG was responsible. From these factors, the jury could have inferred an intent to commit violent crimes to maintain or further TCG's reputation in the community as a fearsome gang and to maintain or enhance their own positions within TCG.

The Government does not need to prove that the defendant's "sole or principal motive" was to maintain or increase his position in the enterprise. *United States v. Smith*, 413 F.3d 1253, 1277 (10th Cir. 2005), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009). Rather, the Government need only establish that the predicate violent crime was committed as an "integral aspect of membership" in the enterprise (TCG). *Id*.; *see*

38

*United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) (noting that one could be guilty under § 1959 if the violent crime was "an integral aspect of membership" even if it was not the "sole or principal motive").

Mr. Daniel Maumau and Mr. Toki focus on the personal nature of the dispute. In their eyes, Mr. Toki wanted to retaliate for being interrupted during sex and punched in the face. Because the shooting was based on personal motives, they continue, the evidence was insufficient to tie the shooting to their status in TCG.

For this argument, Mr. Daniel Maumau and Mr. Toki cite cases holding that the fifth element was satisfied when the predicate assault was directed at a rival gang or at someone who had threatened the activities of the gang. *E.g.*, Daniel Maumau's Opening Br. at 19-23. The two defendants argue that these cases are distinguishable because they involved the functioning of the gang, unlike the personal affront to Mr. Toki. *Id.* at 24-27.

In the view of Mr. Daniel Maumau and Mr. Toki, the Government's evidence resembles that in *United States v. Thai*, 29 F.3d 785 (2d Cir. 1994), and *United States v. Jones*, 291 F. Supp. 2d 78 (D. Conn. 2003), two of the cases invoked by Mr. Daniel Maumau. *E.g.*, Daniel Maumau's Opening Br. at 21-23.

In *Thai*, the defendant, a gang leader, was offered $10,000 to bomb a building; in attempting to execute his plan, the gang leader employed fellow gang members. *See Thai*, 29 F.3d at 818. The Government argued that the fifth element

39

was satisfied because the gang's purpose was to make money through crime. The Second Circuit Court of Appeals disagreed, reasoning that the evidence did not connect the bombing to the gang. *Id.* Because any such connection was based on "pure speculation," the court reversed the § 1959 conviction. *Id.*

The facts in *United States v. Jones*, 291 F. Supp. 2d 78 (D. Conn. 2003), were similar. There the defendant, another gang leader, confronted an acquaintance who had allegedly disrespected the defendant's girlfriend; the defendant retaliated by killing the acquaintance with the help of two friends. The Government argued that without retaliation, the insult would have diminished the defendant's reputation in the gang. But the district court concluded that the evidence did not "support an inference that any act of disrespect directed at Jones personally was also an affront or threat to the [gang's] and Jones's leadership position." *Jones*, 291 F. Supp. 2d at 88, 92.

Our facts bear some similarity to the facts in *Thai* and *Jones*. For example, the jury could infer that Mr. Toki went to the Faamausili home for personal reasons rather than to advance the standing of his gang. But the jury could also have inferred an effort to promote the gang and Mr. Toki's status within the gang.

In inferring an intent to promote the gang, the jury could have focused on three aspects of Mr. Toki's retaliation. First, Mr. Toki retaliated by recruiting two other TCG members, Mr. Kamoto and Mr. Daniel Maumau. Second, when the three men fired, two of them donned blue bandanas, the signature clothing of

40

TCG.  Third, the shooting took place in broad daylight.  Without any evidence of concealment, the jury could infer that Mr. Toki intended to instill fear in the community, one of TCG's purposes.

The jury could have found not only an intent to promote the reputation of TCG, but also an intent to enhance Mr. Toki's standing with the gang.  *See United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001) (concluding that "section 1959 encompasses violent crimes intended to *preserve* the defendant's position in the enterprise *or* to *enhance* his reputation and wealth within that enterprise").  For example, the jury could have inferred that Mr. Toki's reputation for toughness would have diminished by a failure to retaliate after being punched in the face.

Viewing the evidence in the light most favorable to the Government, a jury could reasonably conclude that Mr. Daniel Maumau and Mr. Kamoto responded to an assault on Mr. Toki, one of their fellow gang members, to maintain their reputations and TCG's.  Though the motive may have been partly personal, the jury could also have found that Mr. Toki acted with the "integral or essential" purpose of promoting the gang and maintaining or advancing his position in the gang.

        (ii)    The Robberies of Gen X, El Pollo Loco, and Jack in the Box

Mr. Kepa Maumau challenges the sufficiency of the evidence supporting his VICAR conviction relating to the 2008 robberies of the Gen X Clothing store, the

El Pollo Loco, and the Jack in the Box. He argues that the Government failed to provide sufficient evidence that he had committed these robberies for the purpose of maintaining or increasing his position in TCG. We disagree. The evidence allowed the jury to infer the required connection to TCG from: (1) an accomplice's testimony that TCG members were expected to commit crime and that the robberies served to enhance his reputation and Mr. Kepa Maumau's, (2) the "Exit Plan" document, which was written by Mr. Kepa Maumau and found in his car, describing his involvement with TCG and his desire to enhance his criminal reputation by committing crimes, and (3) testimony that the two robbers wore blue bandanas (TCG insignia) when stealing from the Jack in the Box.

According to Mr. Kepa Maumau, "there was no evidence presented here that these robberies had any connection to TCG other than the fact that Mr. [Kepa] Maumau and Mr. Kamoto were allegedly members." Kepa Maumau's Opening Br. at 49. But Mr. Kepa Maumau's accomplice (Mr. Kamoto) testified that he and Mr. Kepa Maumau were TCG members, that TCG members were expected to commit crimes, and that criminal activity served to advance their reputations in the gang. Mr. Kamoto also testified that the crimes had raised his status in the gang and that he had received greater attention from fellow gang members upon his release from prison. This testimony supports the inference that the gang not only knew about the robberies, but also encouraged members to engage in this type of criminal behavior.

42

The Government also presented a document titled the "Exit Plan," which was discovered in Mr. Kepa Maumau's car after the Arizona robberies. In this document, Mr. Kepa Maumau described his involvement in TCG and confirmed that he had committed crimes to advance his reputation in the gang.

Finally, a witness to the Jack in the Box robbery testified that the two robbers were wearing blue bandanas, the signature clothing of TCG.

When viewed in the light most favorable to the Government, this evidence sufficed for a jury to conclude that Mr. Kepa Maumau had committed the robberies to maintain or further his position in TCG.

### 4. Sufficiency of the Gun Evidence under 18 U.S.C. § 924(c)

Finally, Mr. Tuai argues that the evidence was insufficient for a jury to find that he brandished a gun during the Wal-Mart robbery. The deficiency, according to Mr. Tuai, is the absence of any evidence that the gun was real. We disagree. A jury could infer that the gun was real based on testimony by Mr. Tuai's accomplice in the Wal-Mart robbery and a victim in the robbery, surveillance video of the robbery, and the discovery of a matching gun used by Mr. Kamahele during another robbery.

The Government must prove that the defendant used a real gun when committing the predicate offense. *See United States v. De León-Quiñones*, 588 F.3d 748, 751 (1st Cir. 2009) ("A conviction under 18 U.S.C. § 924(c) requires proof that the defendant used a real firearm when committing the predicate

43

offense."); 18 U.S.C. § 921(a)(3)(A) (2006) (defining the term "firearm"). But the Government need not produce the actual gun that was used. *See United States v. Floyd*, 81 F.3d 1517, 1526 (10th Cir. 1996) (rejecting a challenge to the sufficiency of the evidence under § 924(c) based on a failure to present the actual gun in evidence). Rather, "[c]redible witness testimony is sufficient to establish that a defendant possessed a firearm during the commission of a crime." *Id.*

Sufficient evidence existed for the jury to infer that the gun used in the Wal-Mart robbery was real. For example, Mr. Latutaofieiki Fakaosiula, who acted as the lookout during the robbery, testified that: (1) the plan had called for Mr. Kamahele to carry a gun, and (2) Mr. Kamahele had carried a sawed-off shotgun on the night of the robbery.

Wal-Mart employee Bethany Powell confirmed Mr. Fakaosiula's testimony. Ms. Powell testified that when Mr. Kamahele had approached her outside the cash office, he lifted his shirt and showed her a gun that looked like a sawed-off shotgun. She added that she had felt the gun being pushed against her back during the robbery.

The jury not only heard this testimony, but also saw the surveillance videos showing one of the robbers carrying a long gun.

Finally, the jury heard evidence that Mr. Kamahele had used a sawed-off shotgun (the same type of weapon) when he robbed the Republic Parking Garage

earlier that year, as well as evidence that the police discovered two shotguns—one of which was sawed-off—outside the house where Mr. Kamahele was arrested.

From this evidence, the jury could reasonably infer that Mr. Kamahele had used a real shotgun during the Wal-Mart robbery. *See United States v. Bowers*, 638 F.3d 616, 619 (8th Cir. 2011) (concluding that "[t]he possibility that a gun is fake does not prevent a reasonable jury from determining the gun was real"); *see also United States v. Kirvan*, 997 F.2d 963, 966-67 (1st Cir. 1993) (upholding a conviction under § 924(c) based on two lay witnesses' testimony); *Parker v. United States*, 801 F.2d 1382, 1383-85 (D.C. Cir. 1986) (upholding a conviction under § 924(c) when the gun was never recovered and the only evidence offered by the government was the testimony of two bank employees that the defendant had carried a gun and that he had threatened to "'[b]low [their] . . . head[s] off'"). Accordingly, we reject Mr. Tuai's argument.

### V. Individual Issues Raised by the Defendants

Having addressed the two issues affecting all the defendants, we turn to the issues raised by the individual defendants. These issues involve arguments that the jury instructions were erroneous, the prosecutor committed misconduct, a photo array was too suggestive, the court violated federal law in excusing venirepersons, and the court erred in imposing the sentence.

*A.      Jury Instructions*

Mr. Daniel Maumau challenges the VICAR jury instructions relating to the Faamausili-home shooting,[15] urging a failure to require a link to the Defendant's membership in TCG.  These challenges fail because:  (1) the instructions required proof that TCG membership had provided an "integral or essential purpose" for the home shooting, and (2) the Government had to prove only that the defendant committed the crime in furtherance of his TCG membership.

Mr. Tuai questions the instruction on the RICO conspiracy count, arguing that it did not require an agreement for the commission of two predicate acts.  We reject the argument because it isolates certain language without consideration of the instruction as a whole.

### 1.      The Scope of Our Review

We engage in de novo review of the jury instructions as a whole, determining whether "they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues." *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006).  Reversal is warranted only if:  (1) the Court has "'substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations,'" and (2) the "'deficient jury instruction is prejudicial.'"  *United States v. Hutchinson*, 573 F.3d

---

[15]      Mr. Toki joins in Mr. Daniel Maumau's jury-instruction argument.  Toki's Opening Br. at 1.

46

1011, 1019 (10th Cir. 2009) (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497

F.3d 1079, 1093 (10th Cir. 2007)).

2.    VICAR Instruction

In Instruction No. 40, the district court stated that on the VICAR charge

against Mr. Daniel Maumau, the Government had to prove:

> *First*, that on or about the time period described in this
> Second Superseding Indictment, TCG was a criminal
> enterprise;
>
> *Second*, that the enterprise engaged in racketeering
> activity;
>
> *Third*, that the particular Defendant assaulted with a
> dangerous weapon an individual, as described in the
> particular Count, as [the district court had] just defined
> those terms for [the jury], or aided and abetted in the
> assault with a dangerous weapon;
>
> *Fourth*, that the particular Defendant's purpose in
> assaulting the individual with a dangerous weapon, or
> aiding and abetting in the act, was to maintain or to
> increase his position in the enterprise. *The particular
> Defendant's purpose to maintain or increase his position
> in the enterprise need not [have been] the only purpose
> for committing the act, but the government [had to]
> prove beyond a reasonable doubt that the purpose was
> an integral, or essential, purpose*.

Instruction No. 40, Daniel Maumau R. vol. 1, pt. 2, at 274 (emphasis added).

Mr. Daniel Maumau asserts two errors with the fourth part of this

instruction:  (1) The jury could find guilt even if the shooting did not relate to the

Defendant's membership in TCG; and (2) the reference to an "integral or essential

47

purpose" did "not connect the essential or important purpose in committing the [Faamausili-home shooting] to membership in TCG." Daniel Maumau's Opening Br. at 30-31.

### a. Alternative Methods of Establishing Motive

Mr. Daniel Maumau's first challenge is based on his reading of *United States v. Smith*, 413 F.3d 1253 (10th Cir. 2005), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009). In *Smith*, we concluded that the Government need only prove that the "crime was 'committed as an integral aspect of membership'" in the enterprise to establish this element of a § 1959(a) offense, not that the defendant's "sole or principal motive for conspiring to murder . . . was to maintain or increase his position in [the enterprise] in order for it to convict Mr. Smith under § 1959(a)." 413 F.3d at 1277-78 (quoting *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994)). We added that "'the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise *or* that he committed it in furtherance of that membership.'" *Id*. at 1278 (emphasis added; quoting *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001)).

Mr. Daniel Maumau's argument is based on reading the "or" in this sentence in the conjunctive. Under his reading, the prosecution would have to establish two purposes: (1) that the defendant committed the violent crime because he knew it

48

was expected of him due to his membership, and (2) that the defendant committed the violent crime to further his membership.

Instead, we read *Smith*'s language in the disjunctive. After all, in *Smith*, we used the word "or" rather than "and."[16] Thus, we conclude that the district court did not have to require the jury to find that Mr. Daniel Maumau had fired the gun because he knew it was expected of him as a TCG member *and* that he had fired the gun in furtherance of that membership. Under *Smith*, either one would have sufficed.

We also reject Mr. Daniel Maumau's argument regarding the failure to include the second, alternative method of finding the required motive. This alternative would have made it easier to convict Mr. Daniel Maumau on this count; thus, even if the omission involved error, the error worked to the Defendant's benefit.

b.      Any Essential or Important Purpose

Mr. Daniel Maumau also argues that the district court's instruction could be read to mean that "this element is established if [he] had *any* essential or important

---

[16]      In his opening brief, Mr. Daniel Maumau seems to agree. While arguing that there was insufficient evidence to convict under VICAR, Mr. Daniel Maumau stated that the fifth element of VICAR required only that "the defendant knew it was expected of him due to his membership in the enterprise *or* that it was committed in furtherance of that membership." *See* Daniel Maumau's Opening Br. at 19 (emphasis added) (discussing the holding in *Smith*). Mr. Daniel Maumau's counsel also stated in oral argument that these two methods of establishing the motive requirement were "alternatives."

49

purpose in committing the act." Daniel Maumau's Opening Br. at 31 (emphasis added). We disagree. The instruction stated that "[t]he particular Defendant's purpose to maintain or increase his position *in the enterprise* need not be the only purpose for committing the act, but the government must prove beyond a reasonable doubt that *the purpose* was an integral, or essential, purpose." Daniel Maumau R. vol. 1, pt. 2, at 274 (emphases added).

"The purpose" in the second clause of this sentence refers to the purpose in the first clause, which was limited to maintaining or increasing a position in the enterprise. And, the first sentence in this part of the instruction made clear that the purpose was connected to TCG by requiring proof that the defendant's purpose "in assaulting the individual with a dangerous weapon, or aiding and abetting in the act, was to maintain or to increase his position *in the enterprise*." *Id.* (emphasis added). Accordingly, we reject Mr. Daniel Maumau's argument that the instruction allowed the jury to find guilt if he had any purpose, even a lawful one.

### 3. RICO Instruction

Mr. Tuai also challenges the district court's instruction on the RICO charge in Count 1, conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d) (2006). According to Mr. Tuai, the district court erred by failing to instruct the jury that it had to find that he had agreed that either he or another member of the enterprise, TCG, would commit at least two predicate racketeering acts. We disagree.

50

The district court twice instructed that a conviction required the defendant to agree to participate in the affairs of the enterprise through a pattern of racketeering activity, which it defined (by incorporating the Second Superseding Indictment) as an agreement that a conspirator would commit at least two acts of racketeering in conducting the affairs of the enterprise. With this definition, the district court adequately informed the jury that it could find guilt only if it concluded that Mr. Tuai had known about and agreed to the commission of at least two racketeering acts. Thus, the district court did not broaden the scope of RICO conspiracy by requiring only that Mr. Tuai associate "in some manner" with TCG.

On Count 1, the district court instructed the jury:

> The fourth element the government must prove beyond a reasonable doubt is that the particular Defendant knowingly and willfully became a member of the conspiracy. This means that in order to meet its burden of proof, the government must show that the particular Defendant agreed to participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity as described in the Second Superseding Indictment.

> The focus of this element is on the particular Defendant's agreement to participate in the objective of the enterprise to engage in a pattern of racketeering activity, and not on the particular Defendant's agreement to commit the individual acts. *The government must prove that the particular Defendant participated in some manner in the overall objective of the conspiracy, and that the conspiracy involved, or would have involved, the commission of two racketeering acts.* The government is not required to prove either that the particular Defendant agreed to commit two racketeering acts or that he actually committed two such acts, although you may conclude that he agreed to participate in the conduct of the enterprise from proof that he agreed to commit or actually committed such acts.

51

For the purposes of this count, the Second Superseding Indictment alleges that nine racketeering acts were or were intended to be committed as part of the conspiracy. I will discuss those racketeering acts with you in greater detail in a moment. Again, the government must prove that two of these acts were, or were intended to be, committed as part of the conspiracy, although it need not prove that the particular Defendant committed or agreed to commit any of these acts *as long as the government proves that the particular Defendant participated in some manner in the overall objective of the conspiracy.*

Instruction No. 33, Tuai R. vol. 1, pt. 4, at 739 (emphasis added).

Mr. Tuai argues that the district court erred in giving this instruction because it did not require proof of an agreement that two or more predicate acts would be committed by a member of the conspiracy. For support, Mr. Tuai relies on *United States v. Smith*, where we held:

[I]n order to convict a defendant for violating § 1962(d), the Government [had to] prove beyond a reasonable doubt that the defendant: (1) *by knowing about and agreeing to facilitate the commission of two or more acts* (2) constituting a pattern (3) of racketeering activity (4) participate[d] in (5) an enterprise (6) the activities of which affect[ed] interstate or foreign commerce.

*United States v. Smith*, 413 F.3d 1253, 1266 (10th Cir. 2005) (emphasis added), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009).

Mr. Tuai argues that the instruction does not require proof that the defendant joined the conspiracy with knowledge that it would involve two or more

racketeering acts.[17]  According to Mr. Tuai, the district court broadened the scope of a RICO conspiracy by requiring only that he associate "in some manner" with TCG.  Tuai's Opening Br. at 46.  We reject this contention because the requirement is fairly included in the instructions when read as a whole.

When considered as a whole, the instructions informed the jury that § 1962(d) required proof that Mr. Tuai had known about and agreed to the commission of two or more racketeering acts.  It is true that the instructions included broader language that the defendant had to "participate[] in some manner in the overall objective of the conspiracy."  But in two places, the instructions also required knowledge of and an agreement with the purpose of the conspiracy, which was to commit two or more racketeering acts.

---

[17]    At oral argument, counsel discussed whether the district court erred by failing to include the "agreed to and facilitate" language in *Smith*.  But Mr. Tuai did not challenge the instructions based on the omission of this language.  As a result, we decline to address the need to include the "agreed to and facilitate" language from *Smith*.

If we were to address the issue, we would need to address the different terminology in *Smith*, for the opinion refers to the requirement (in different places) in both the conjunctive and disjunctive.  In one part, for example, we stated that the conspiracy element is satisfied only if a defendant "knew about *and* agreed to facilitate the commission of . . . at least two of the predicate acts constituting a pattern of racketeering activity."  *Smith*, 413 F.3d at 1272 (emphasis added).  Elsewhere, we stated that a defendant can be convicted if he "knew about *or* agreed to facilitate" the acts.  *Id*. at 1265 (emphasis added).  But, we need not decide whether the "facilitation" prong is conjunctive or disjunctive because Mr. Tuai did not address the issue in his brief.

The instructions stated that to find guilt, the jury had to conclude that the defendant "agreed to participate, directly or indirectly, in the affairs of the enterprise *through a pattern of racketeering activity as described in the Second Superseding Indictment*." Instruction No. 33, Tuai R. vol. 1, pt. 4, at 739 (emphasis added). And the Second Superseding Indictment expressly stated that "each defendant *agreed* that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise." *Id*. at 739, 773 (emphasis added); *see United States v. Davis*, 55 F.3d 517, 520 (10th Cir. 1995) (stating that incorporation of the indictment within the instruction clarified that the violation of § 924(c) had to be based on a separate underlying offense).

Mr. Tuai focuses on part of Instruction No. 33 without consideration of the language as a whole. In this instruction, the district court referred to the allegation of nine racketeering acts, reminding the jury: "Again, the government must prove that two of these [racketeering] acts were, or were intended to be, committed as part of the conspiracy." Instruction No. 33, Tuai R. vol. 1, pt. 4, at 739. Then, the district court clarified that the defendant could be guilty even if the racketeering acts were to be committed by someone else. *Id*. In making that clarification, the district court added that if the crimes were to be committed by someone else, the defendant would be guilty only if the government proved that the defendant "participated in some manner in the overall conspiracy." *Id*.

54

Mr. Tuai points out that when the district court added this clarification, it did not say that the Government had to prove an agreement to commit two or more racketeering acts. But, the district court had just said it—in the same sentence—in no uncertain terms. *See id.* ("Again, the government must prove that two of these [racketeering] acts were, or were intended to be, committed as part of the conspiracy.").

Accordingly, we conclude that the instructions (when read as a whole) adequately informed the jury that it could find guilt only if the defendant joined the conspiracy agreeing that two or more racketeering acts would be committed.

### B. Prosecutorial Misconduct

Mr. Kamahele argues that the trial was unfair because: (1) the prosecutor improperly asked a probation officer about the contents of a backpack found during a search of his home, and (2) the prosecutor improperly questioned a witness, Mr. Epeti Naa, who refused to answer questions and invoked his Fifth Amendment right not to incriminate himself. According to Mr. Kamahele, the misconduct should have led the district court to grant his motion for a mistrial.

We reject both arguments because: (1) the record does not suggest bad faith when the prosecutor asked the agent to describe the contents of the backpack, and (2) the record supports the district court's conclusion that the prosecutor was unaware that the witness would refuse to answer all questions and invoke the Fifth Amendment.

1.   Statements Regarding the Contents of the Backpack

In the midst of the trial, Mr. Kamahele's counsel raised a concern with an exhibit, which was listed as "gang poetry" on the Government's exhibit list. The disputed exhibit was a document that a probation officer had found in a backpack in Mr. Kamahele's room. Defense counsel asked the district court to bar description of the document as "gang poetry," and the district court prohibited reference to "gang poetry" without establishing a foundation that the witness could identify the contents as "gang poetry." Kamahele R. vol. 3, pt. 4, at 862.

Later that day, the prosecutor called Mr. Kamahele's probation agent to testify. The prosecutor asked the agent if she had found anything when she searched Mr. Kamahele's room. The following exchange took place:

A.   I found his backpack.

Q.   Well, let me ask you this. You found a backpack in his room?

A.   Yes.

Q.   Did you open the backpack and search the contents?

A.   Yes, I did.

Q.   And what, if anything, did you locate in the backpack?

A.   I found a total of five items, a Huntington Beach handgun, pellet gun, three nine millimeter bullets, one .22 caliber bullet, a letter with a TC -- TCG gang information on it, and a blue bandan[]a.

*Id*. at 1031-32.

56

Counsel for Mr. Kamahele objected, noting that "the Court had already addressed [the gang-poetry] issue, characterization, of what's in there." *Id*. at 1032. The parties and the district court then held a sidebar conference; afterward, the district court gave the following curative instruction: "Members of the jury, there may have been a mistake about what the witness saw, okay? . . . . But disregard any of that evidence, okay? That is not credible evidence for you to consider." *Id*. The district court then dismissed the jury for the day.

Outside the jury's presence, Mr. Kamahele's counsel moved for a mistrial. Defense counsel argued that: (1) the prosecution had not disclosed an intent to present evidence of what was in the backpack, and (2) the prosecutor had "g[iven] her word" that the bandana, guns and ammunition, and "gang poetry" would not be presented at trial. *Id*. at 1033-34.

The prosecutor stated she had intended to offer the "gang poetry" document and the blue bandana, but conceded that she had agreed the air gun and ammunition would not be introduced.[18] The prosecutor added that she could not recall whether she had told the witness not to mention the pellet gun and ammunition, which were unrelated to the Wal-Mart robbery; but the prosecutor did

_____

[18]     The "gang poetry" referred to the number "104," which the prosecution had hoped to offer as evidence of gang activity by connecting the number to Glendale and the TCG.

remember telling the witness that these items were not relevant and would not be introduced.

Ultimately, the district court adopted defense counsel's suggested curative measure of striking all of the probation officer's testimony about the backpack's contents. Accordingly, the district court gave a curative instruction the following day:

> One of the things I think I was not clear about, and I apologize, was at the end of yesterday I told you to disregard the testimony of our last witness, Special Agent -- or just Agent Cassity, about a backpack that she said was Eric Kamahele's. Let me tell you why I told you to disregard it. It's plain and simple. She was wrong. And you will probably note that throughout any proceedings people make mistakes.
>
> Now this isn't the kind of mistake where one side said it was right and one side said it was wrong, but the kind of mistake where everybody agrees she was wrong. She was wrong. That's not Mr. Kamahele's backpack. So you disregard it. It's not relevant.

Kamahele R. vol. 3, pt. 5, at 1059. Mr. Kamahele's counsel did not object to this instruction.

We review the district court's denial of the motion for a mistrial based on an abuse of discretion. *See United States v. Gabaldon*, 91 F.3d 91, 93-94 (10th Cir. 1996) (differentiating between instances when no motion for a mistrial is filed, which is reviewed de novo because "the district court has not exercised its discretion"). A district court has discretion to grant a mistrial only when a

58

defendant's right to a fair trial has been violated. *See United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004).

A trial may become unfair when a prosecutor commits misconduct. Generally, we undertake a two-part inquiry to review prosecutorial misconduct. The threshold question is whether the conduct was improper. If it was, we determine whether the improper conduct requires reversal. *See United States v. Kravchuk*, 335 F.3d 1147, 1153 (10th Cir. 2003).

We consider three factors when the alleged misconduct implicates a prosecutor's solicitation of an improper answer from a testifying witness: (1) "whether the prosecutor acted in bad faith, (2) whether the district court limited the effect of the improper [answer] through its instructions to the jury, and (3) whether the improper [answer] was inconsequential in light of the other evidence of the defendant's guilt." *Meridyth*, 364 F.3d at 1183.

Mr. Kamahele does not suggest bad faith when the prosecutor asked the agent to describe the contents of the backpack. The mistake appears to be innocent, for the prosecutor informed the district court that she had previously instructed the witness not to discuss the guns and ammunition. It is true that the prosecutor could not remember whether she had told the witness not to discuss the contents of the backpack, but we have no basis to infer bad faith.

The curative instructions served to mitigate any possible prejudice. The district court told the jury that the agent was wrong when she stated that the

59

contents of the backpack were Mr. Kamahele's. Indeed, the district court went a step further by stating that the opposite was true: that the backpack did not belong to Mr. Kamahele. This curative instruction served to lessen the impact of the stricken testimony.

Finally, the agent's statement about the contents appears inconsequential in light of other evidence involving Mr. Kamahele's gang involvement and use of guns. One admitted participant in the Wal-Mart robbery, Mr. Fakaosiula, testified that Mr. Kamahele was the man who had carried the sawed-off shotgun during the Wal-Mart robbery. With that testimony, we are hard-pressed to question the fairness of the trial based on the agent's stricken testimony.

The three factors weigh against reversal, and we conclude that the district court acted within its discretion by denying the motion for a mistrial.

### 2. Mr. Epeti Naa's Invocation of the Fifth Amendment

Mr. Kamahele also contends that the Government called a witness, Mr. Epeti Naa, knowing that he would refuse to testify. To Mr. Kamahele, this action constituted prosecutorial misconduct impeding his right to a fair trial. We disagree. The district court found that the prosecutor had not known that Mr. Naa would refuse to answer all questions, and this finding did not constitute plain error.

The Government called Mr. Epeti Naa as a witness to testify regarding the eleventh and twelfth counts of the Second Superseding Indictment. When the

prosecutor asked Mr. Naa whether he lived in Utah, he refused to answer. When asked if he had heard the question, Mr. Naa replied that he had, but that he "actually didn't want to have anything to say." Tuai R. vol. 3, pt. 16, at 3182-83.[19] At that point, the district court excused the jury.

When questioned by the district court, the prosecutor admitted that he had known that Mr. Naa was "unhappy about being here" and "not [in] a comfortable situation," but had not known that Mr. Naa would refuse to answer a single question. *Id*. at 3183. The district court accepted this explanation and found that the prosecutor had not committed misconduct.

Because Mr. Kamahele did not contemporaneously object or move for a mistrial, we confine our review to the plain-error standard. *See United States v. Taylor*, 514 F.3d 1092, 1095 (10th Cir. 2008) ("[I]n cases of prosecutorial misconduct in which the defendant makes no objection, our precedent limits us to plain error review."). Under this standard, the defendant must show that the district court erred, that the error was plain, that the error affected his substantial rights, and that the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 1100. Mr. Kamahele has not shown plain error.

---

[19] This portion of the trial transcript was not included in Mr. Kamahele's record on appeal.

61

A prosecutor cannot call witnesses solely for them to invoke the Fifth Amendment privilege against self-incrimination. *United States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999). But the prosecutor denied knowing that Mr. Naa would invoke his Fifth Amendment privilege, and the district court accepted this statement as truthful.

Even if the finding constituted an obvious error, however, reversal would be unwarranted because Mr. Kamahele has not shown any effect on his substantial rights. *See United States v. Gonzalez Edeza*, 359 F.3d 1246, 1250 (10th Cir. 2004) (noting that plain error is established only "[i]f all four prongs are satisfied"). Mr. Kamahele's substantial rights were not involved. The trial involved eight defendants, and the jury had no reason to suspect that Mr. Naa would testify about Mr. Kamahele. Accordingly, Mr. Kamahele provides no basis for us to find plain error from Mr. Naa's invocation of the Fifth Amendment.

C.      *Suggestiveness of a Photo Array*

The police used a photo array to identify the Gen X robbers. Two of the victims identified a robber from the photographs, and the individual identified was Mr. Kepa Maumau. He argued that the array was unduly suggestive and that the district court should exclude the employees' identifications. The district court concluded that the photo array was not unduly suggestive, and we agree. Even if it were, however, reversal would not be warranted in light of the reliability of the witnesses' identifications.

1.      Standard of Review

When reviewing the admission of a photo array used to identify a defendant, we apply the clear-error standard to factual findings and engage in de novo review of due-process issues.  *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994).

When we review a defendant's challenge to an identification from the photo array, we conduct a two-pronged inquiry.  We first determine whether the photo array was unduly suggestive; if it is, we decide whether the identifications were still reliable in view of the totality of the circumstances.  *See United States v. Wiseman*, 172 F.3d 1196, 1208 (10th Cir. 1999).

Ultimately, we must determine whether the unduly suggestive array created a "substantial likelihood of misidentification."  *Neil v. Biggers*, 409 U.S. 188, 201 (1972).  If so, the defendant's due-process rights have been violated.  *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony.").

2.      Unduly Suggestive

Under the first prong, we consider the number of photographs in the array, the way that the police present the array, and the details of the photographs.  *See Sanchez*, 24 F.3d at 1262.  Though we consider the number of photographs in the array, this factor goes to the "weight given to other alleged problems or

irregularities in an array"; the number is not itself a substantive factor. *Id*. (emphasis omitted).

After police detectives viewed the Gen X surveillance video, they believed that the robbers were Kepa Maumau and Edward Kamoto. A police detective then created an array of six photographs to show the three Gen X employees who had seen the crime. Two of the three employees identified Mr. Kepa Maumau as the robber; the third was unable to make an identification.

During the motion-to-suppress hearing, the Government called the detective who had created the array and shown the array to the employees. In response, Mr. Kepa Maumau called an expert, Dr. David Dodd, to testify about eyewitness reliability. Dr. Dodd testified that the "functional size" of the photo array was actually 1.7 photographs, rather than 6, based on a mock-photo array using 12 mock witnesses.[20] After hearing this testimony, the district court found that the array was not unduly suggestive. This finding did not involve clear error.

First, we consider the size of the array: six photos. Though six is "a number sufficiently small to weigh heavily in the balance of factors to be

---

[20]    The mock witnesses were told the employees' description of the suspect—Native American, medium build, early twenties, no facial hair, no scars or tattoos, and approximately five-feet, ten-inches tall. Then Dr. Dodd showed the mock witnesses the actual photo array used by the police detective. Seven of the twelve mock witnesses chose Mr. Kepa Maumau, and the remaining five chose the man in the fourth picture. Dr. Dodd reached the 1.7 size by dividing the total number of mock witnesses by the number that had chosen Mr. Kepa Maumau.

considered," it does not create a "per se unconstitutional" array. *Sanchez*, 24 F.3d at 1262-63.[21]

We also consider the presentation of the array. The district court found that the police detective had presented the photo array in a neutral manner, admonishing the witnesses not to identify anyone if they were unsure, telling them not to guess, and saying that they had no obligation to identify anyone. Kepa Maumau R. vol. 1, pt. 2, at 306-07. Mr. Kepa Maumau does not supply any reason to regard these findings as clearly erroneous.

Finally, we consider the details of the photographs. The district court found that each photograph depicted a man in his early twenties with "medium complexion, medium build, no visible piercings, and most ha[d] little, if any, facial hair," and none had "distinctive facial features or other identifying marks." *Id.* at 306. The district court went on to acknowledge the difference in the facial features, but did not find the differences so "strikingly apparent" as to taint the display. *Id.* Again, Mr. Kepa Maumau does not supply grounds to regard the finding as clearly erroneous.

---

[21]     We have stated that the use of six-person photo arrays does not in itself lead to a finding of undue suggestiveness. *E.g.*, *Sanchez*, 24 F.3d at 1263 (holding that an array with six photographs was not impermissibly suggestive); *United States v. Franklin*, 195 F. App'x 730, 734-35 (10th Cir. 2006) (concluding that a six-pack photo array was not unduly suggestive).

We agree with Mr. Kepa Maumau that the size of the photo array weighs in his favor.  For three reasons, however, we reject his argument that the array was unduly suggestive based on differences in facial features and the others' lack of facial hair.

First, we have held that a difference in facial hair—even when the suspect was the only one with a beard and braided hair—did not render the photo array unduly suggestive.  *See United States v. Flores*, 149 F.3d 1272, 1278-79 (10th Cir. 1998) (holding that a photo array was not unduly suggestive even though the suspect was the only person in the array with a goatee); *United States v. Thurston*, 771 F.2d 449, 453 (10th Cir. 1985) (concluding that a photo array was not unduly suggestive even though the defendant's "picture was the only one among the display exhibits which had a beard").

Second, the actual robber had covered the bottom portion of his face during the Gen X robbery.  Thus, the witnesses would lack any apparent reason to focus on a subject based on his facial hair (or lack of facial hair).

Third, "a photo lineup is not necessarily suggestive merely because the individuals in the lineup differ in facial characteristics." *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993).  In fact, even Mr. Kepa Maumau's expert agreed that some variation among facial features was useful. *See* Kepa Maumau R. vol. 4, pt. 1, at 90 (Dr. Dodd's testimony agreeing that "lineups should not be composed

66

of individuals who are too similar to one another" and that "some degree of variation among the individuals [was] desirable").

Accordingly, the district court did not err in finding that the array was not unduly suggestive.

### 3. Reliability of Identifications

Even if we were to conclude that the array was unduly suggestive, we would decline to reverse because the identifications were reliable.

When a photo array is unduly suggestive, we consider whether it is sufficiently reliable to satisfy due process. *See United States v. Sanchez*, 24 F.3d 1259, 1261-62 (10th Cir. 1994). For reliability, the pertinent factors include: (1) the opportunity of the witness to view the suspect during the crime, (2) the witness's level of attention during the crime, (3) the accuracy of the witness's prior description of the suspect, (4) the level of certainty the witness demonstrated during the array, and (5) the time lapse between the crime and the array. *See United States v. Wiseman*, 172 F.3d 1196, 1210 (10th Cir. 1999).

The employees' identifications were sufficiently reliable even if we were to conclude that the array was unduly suggestive.

Mr. Kepa Maumau makes three arguments on reliability: (1) The witnesses are Hispanic and he is Polynesian, making the identification problematic because it is "cross racial"; (2) the witnesses were unable to provide certain details of the robbers in their descriptions, such as eye color or facial shape; and (3) the

67

circumstances of the robbery made identification difficult because the event took place in only about a minute and multiple robbers were involved. We reject these arguments.

Though the employees had only about a minute to observe the robbers, they were within eight feet. The employees were not only close, but also able to describe the robber with the gun as a Native American man in his early twenties with no scars, tattoos, or marks, with a medium build and approximately five-feet, ten-inches tall. And the employees viewed the array separately only about three months after the robbery. *See* Kepa Maumau R. vol. 4, pt. 1, at 17 (noting that the robbery took place in August 2008). Finally, two of the employees testified that they had recognized Mr. Maumau as someone who had previously visited the store.

The witnesses' identifications were reliable, and we would decline to reverse even if the photo array had been unduly suggestive.

### D. *The Jury Selection and Service Act of 1968*

Mr. Daniel Maumau contends that the district court violated the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 (2006). According to the Defendant, the court erroneously excluded "potential jurors who had indicated in a questionnaire sent by the court clerk that they would be unable to serve on a jury

68

for a six week trial."[22]  Daniel Maumau R. vol. 1, pt. 1, at 149.  Mr. Daniel

Maumau argues that the procedure violated the Jury Selection Act.  This argument

is rejected.

### 1.    The Procedure Used

Under the district court's plan for selection of petit jurors, the "Clerk

[could] grant temporary excuses to prospective jurors on the grounds of undue

hardship or extreme inconvenience."  Daniel Maumau's Opening Br., attachment

2, at 4.  The jury administrator carried out this plan for the trial, telling the 260

prospective jurors that if they felt service would create an undue hardship or

extreme inconvenience, they should reply with their reason.  Some replied by e-

mail, and the jury administrator read the replies and temporarily excused those

whose service would create an undue hardship.

### 2.    Mr. Daniel Maumau's Challenge and the District Court's Ruling

Mr. Daniel Maumau challenged this process under 28 U.S.C. § 1867(a)

(2006), and the district court allowed defense counsel to review the e-mail replies.

After reviewing them, defense counsel filed a sealed supplemental affidavit.

There counsel asserted that "about twenty of th[e]se explanations [in the e-mails]

involve[d] individuals who if subjected to personal questioning by the court may

---

[22]    Mr. Tuai and Mr. Toki join in Mr. Daniel Maumau's jury-selection
argument.  Tuai's Opening Br. at 47; Toki's Opening Br. at 1.

not have qualified as hardship excuses." Appellee Supp. App. at 2. Defense counsel then identified eight potential jurors who had been excused for subjective criteria. *See id.* at 2.

Again, the district court conducted a conference to address defense counsel's continued concern. After the conference, the district court found that the procedure was proper and that any possible statutory deviation would not have involved a substantial violation. The district court added that "there [was] no evidence that the venire [was] anything other than a random cross section of the community" and that "[t]he jury administrator's excusals in no way altered or skewed the composition of the venire." Toki R. vol. 1, pt. 4, at 711-12.

Of the venirepersons summoned, 80 were selected and 15 were selected as jurors.

### 3. Standard of Review

We review a district court's factual determinations involving a jury-composition claim for clear error, but we engage in de novo review of the legal conclusions. *See United States v. Contreras*, 108 F.3d 1255, 1265 (10th Cir. 1997) ("[W]e review the district court's decisions *de novo* to determine whether the jury selection process failed to substantially comply with the Jury Selection and Service Act.").

4.      Jury Selection Act Claim

The Jury Selection Act mandates that a petit jury be composed of a random, fair cross-section of the community.  28 U.S.C. § 1861 (2006).  Remedies become available when the procedure involves a substantial failure to comply with the statute.  28 U.S.C. § 1867(a) (2006).  A failure is considered "substantial" when it "frustrates one of the three principles underlying the Act":  (1) the random selection of jurors, (2) culling of the jury from a fair cross-section of the community, and (3) determination of disqualifications, exemptions, and exclusions based on objective criteria.  *United States v. Carmichael*, 560 F.3d 1270, 1277 (11th Cir. 2009).

Mr. Daniel Maumau raises three arguments:  (1) The jury administrator's striking of venirepersons violated the third principle (that excusals be based on objective criteria); (2) venirepersons can be excused by the district court, but not the jury administrator; and (3) the jury was not composed of a fair cross section of the community.  We reject the arguments because:  (1) the dismissals were based on objective criteria satisfying the Jury Selection Act and Utah Jury Plan, (2) the Jury Selection Act and the Utah Jury Plan authorize the jury administrator to grant excusals, and (3) the excusals did not remove a distinctive group.

a.      Excusal Based on Objective Criteria

Mr. Daniel Maumau argues that:  (1) the administrator's excusal of potential jurors was based on subjective criteria, and (2) eight of the potential jurors'

71

proffered bases for undue hardship warranted further questioning by the district court. We disagree. The reasons proffered by the eight witnesses were legitimate for excusal. Of the eight, four were caring for the "aged or infirm"; two would have had to drive over 100 miles each day; and the final two functioned in key business roles.

> Federal law defines "undue hardship or extreme inconvenience" as
>
> great distance, either in miles or traveltime, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror.

28 U.S.C. § 1869(j) (2006). The law also allows excusal of a venireperson when the trial is expected to take more than 30 days or would result in "severe economic hardship to an employer which would result from the absence of a key employee during the period of such service." *Id.*

The pertinent provisions of the Utah Jury Plan excuse potential jurors from service for undue hardship when individuals are: (1) "essential to the care of aged or infirm persons" or "the operation of a business, commercial or agricultural enterprise," or (2) "resid[e] in an area where private or public transportation to the place of holding court is not readily available." Daniel Maumau's Opening Br., attachment 2, at 3-4.

Accordingly, the eight venirepersons had legitimate reasons for excusal under the Act and the Utah Jury Plan. Mr. Daniel Maumau gives us no reason to disbelieve these reasons or to conclude that the jury administrator used subjective criteria.

### b. Administrator's Excusal Proper

Mr. Daniel Maumau also argues that a prospective juror can be excused by a district court, but not the jury administrator. Under § 1866(c), however, "any person summoned for jury service may be (1) excused by the court, or by the clerk under supervision of the court if the court's jury selection plan so authorizes, upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary." 28 U.S.C. § 1866(c) (2006). Because the statute and the Utah Jury Plan authorized the jury administrator to grant excusals, we reject Mr. Daniel Maumau's argument.

### c. Fair Cross Section

According to Mr. Daniel Maumau, the excusals of jurors violated the statutory requirement for the jury to comprise a fair cross section of the community. We disagree, concluding that the excusals did not remove a distinctive group that would influence Mr. Daniel Maumau's right to an impartial jury.

For this challenge, the Defendant must show:

(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979); *see United States v. Shinault*, 147 F.3d 1266, 1270 (10th Cir. 1998) ("Because the Jury Act's fair cross section requirement parallels a defendant's Sixth Amendment right to trial by an impartial jury, the defendant's Jury Act challenge and his constitutional challenge are both evaluated under the Sixth Amendment standard."). If the defendant shows a prima facie violation, "the government . . . bears the burden of proving that attainment of a fair cross section is incompatible with a significant state interest." *Shinault*, 147 F.3d at 1271.

Mr. Daniel Maumau fails to explain how the process resulted in disqualification of a "distinctive group." In determining whether a group is "distinctive" for these purposes, we consider three factors: (1) whether the group is defined by a "limiting quality (i.e. the group has a definite composition such as race or sex)"; (2) whether "a common thread or basic similarity in attitude, idea, or experience runs through the group"; and (3) whether "a community of interests exists among members of the group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process." *United States v. Green*, 435 F.3d 1265, 1271 (10th Cir. 2006).

74

Without citing authority, Mr. Daniel Maumau asserts that the jury administrator's excusal of prospective jurors "preclud[ed] a venire that constituted a fair cross section of the community." Daniel Maumau's Opening Br. at 15. We cannot discern how excusal of individuals unable to sit for a four- to six-week jury trial would distort the jury pool. *See Silagy v. Peters*, 905 F.2d 986, 1010-11 (7th Cir. 1990) (holding that people older than 70 were not a cognizable "distinctive" group). Thus, Mr. Daniel Maumau has not satisfied the first element of his burden. In these circumstances, we reject his argument.

### E. *Sixth Amendment Right to a Jury Trial*

According to Mr. Daniel Maumau, the Sixth Amendment right to a jury trial was violated by the district court's imposition of a ten-year mandatory-minimum sentence under 18 U.S.C. § 924(c) for discharging a firearm. He argues that the district court erred because the jury found only that he had used or carried the gun—not that he had brandished or discharged the gun. Based on this argument, the Defendant seeks a remand that would direct the district court to impose a five-year sentence.

But Mr. Daniel Maumau now has that five-year sentence. After the completion of briefing, Mr. Maumau and the government jointly moved for a limited remand to allow the imposition of a new sentence. We granted the motion, and the district court resentenced Mr. Daniel Maumau to five years on the § 924(c) count. The resentencing moots Mr. Maumau's challenge to the original sentence.

75

*See United States v. Padilla*, 947 F.2d 893, 897 (10th Cir. 1991) (stating that resentencing of the defendant mooted his challenge to the original sentence).

## VI.    Conclusion

We affirm.